**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 |

**<u>PLAINTIFFS' COUNSEL'S NOTICE OF POTENTIAL TAG ALONG ACTIONS</u>**

Pursuant to Rules 7.2(i) and 7.5(e) of the Rules of Procedure of the Judicial Panel on

Multidistrict Litigation, Plaintiffs' Counsel in *Schwab Money Market Fund, et al. v. Bank of*

*America Corporation, et al.*, No. CV-11-4186-EDL (N.D. Cal.), and *Charles Schwab Bank, N.A.,*

*et al. v. Bank of America Corporation, et al.*, No. CV-11-4187-EDL (N.D. Cal), hereby notify

the Judicial Panel that these two actions involve one or more common questions of fact with, and

assert similar allegations as, the LIBOR-related actions this Panel transferred to the Southern

District of New York, Honorable Naomi Reice Buchwald presiding, pursuant to its Order dated

August 12, 2011. Copies of the complaints are attached as Exhibits A and B.

Plaintiffs respectfully request that this Panel transfer these actions to the Southern District

of New York for inclusion in MDL No. 2262, pursuant to 28 U.S.C. § 1407. Although there are

certain legal and factual differences, these cases arise from the same basic allegations of

manipulation of LIBOR by the defendants and raise similar claims as those cases already consolidated in MDL No. 2262.

Dated: August 26, 2011

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP


By:  /s/ Todd Walburg

Richard M. Heimann
Joseph R. Saveri
Eric B. Fastiff
Brendan Glackin
Todd Walburg
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Steven E. Fineman
Michael J. Miarmi
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Lowell Haky (State Bar No. 178526)
Vice President and Associate General Counsel
THE CHARLES SCHWAB CORPORATION
211 Main Street
San Francisco, California 94105
Telephone: (415) 667-0622
Facsimile: (415) 667-1638

*Attorneys for Plaintiffs*

**Actions**

| Parties | Court | Civ. Action No. | Judge |
|---|---|---|---|
| **Plaintiffs:**<br>SCHWAB MONEY MARKET FUND;<br>SCHWAB VALUE ADVANTAGE MONEY FUND;<br>SCHWAB RETIREMENT ADVANTAGE MONEY FUND;<br>SCHWAB INVESTOR MONEY FUND;<br>SCHWAB CASH RESERVES;<br>SCHWAB ADVISOR CASH RESERVES; SCHWAB YIELDPLUS FUND; SCHWAB YIELDPLUS FUND LIQUIDATION TRUST<br><br>**Defendants:**<br>BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; CREDIT SUISSE GROUP AG; J.P.MORGAN CHASE & CO.; HSBC HOLDINGS PLC; BARCLAYS BANK PLC; LLOYDS BANKING GROUP PLC; WESTLB AG; UBS AG; ROYAL BANK OF SCOTLAND GROUP PLC; DEUTSCHE BANK AG; CITIGROUP, INC.; CITIBANK, N.A.; DEUTSCHE BANK SECURITIES; BANC OF AMERICA SECURITIES, LLC; CREDIT SUISSE SECURITIES (USA) LLC.; UBS FINANCIAL SERVICES INC.; J.P. MORGAN SECURITIES INC.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP FUNDING, INC.; RBS SECURITIES INC. (F/K/A GREENWICH CAPITAL MARKETS, INC.); BANK OF SCOTLAND PLC; CREDIT SUISSE HOLDINGS (USA) INC; CHASE BANK USA; | Northern District of California | CV-11-4186 | Hon. Elizabeth D. Laporte |

| | | | |
|---|---|---|---|
| JPMORGAN CHASE BANK NA; JP MORGAN SECURITIES LLC; HSBC BANK USA; HSBC FINANCE CORPORATION; HSBC SECURITIES (USA) INC; BARCLAYS US FUNDING CORP; LLOYDS TSB BANK PLC; UBS FINANCE (DELAWARE) INC; UBS FINANCIAL SERVICES INC; UBS SECURITIES LLC; DEUTSCHE BANK FINANCIAL LLC; CITIZENS BANK, NA; CITIZENS BANK OF MASSACHUSETTS; CITIZENS BANK OF PENNSYLVANIA; RBS CITIZENS, NA | | | |
| **Plaintiffs:** CHARLES SCHWAB BANK, N.A.; CHARLES SCHWAB & CO., INC.; THE CHARLES SCHWAB CORPORATION<br><br>**Defendants:** BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; CREDIT SUISSE GROUP AG; J.P.MORGAN CHASE & CO.; HSBC HOLDINGS PLC; BARCLAYS BANK PLC; LLOYDS BANKING GROUP PLC; WESTLB AG; UBS AG; ROYAL BANK OF SCOTLAND GROUP PLC; DEUTSCHE BANK AG; CITIGROUP, INC.; CITIBANK, N.A.; DEUTSCHE BANK SECURITIES; BANC OF AMERICA SECURITIES, LLC; CREDIT SUISSE SECURITIES (USA) LLC.; UBS FINANCIAL SERVICES INC.; J.P. MORGAN SECURITIES INC.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP FUNDING, INC.; RBS | Northern District of California | CV-11-4187 | Hon. Elizabeth D. Laporte |

| | | |
|---|---|---|
| SECURITIES INC. (F/K/A Greenwich Capital Markets, Inc.); BANK OF SCOTLAND PLC; CREDIT SUISSE HOLDINGS (USA) INC; CHASE BANK USA; JPMORGAN CHASE BANK NA; JP MORGAN SECURITIES LLC; HSBC BANK USA; HSBC FINANCE CORPORATION; HSBC SECURITIES (USA) INC; BARCLAYS US FUNDING CORP; LLOYDS TSB BANK PLC; UBS FINANCE (DELAWARE) INC; UBS FINANCIAL SERVICES INC; UBS SECURITIES LLC; DEUTSCHE BANK FINANCIAL LLC; CITIZENS BANK, NA; CITIZENS BANK OF MASSACHUSETTS; CITIZENS BANK OF PENNSYLVANIA; RBS CITIZENS, NA, | | |

EXHIBIT A

1   Richard M. Heimann (State Bar No. 063607)
    Joseph R. Saveri (State Bar No. 130064)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan Glackin (State Bar No. 199643)
3   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
4   San Francisco, CA 94111-3339
    Telephone:  (415) 956-1000
5   Facsimile:  (415) 956-1008

6   Steven E. Fineman (State Bar No. 140335)
    Michael J. Miarmi
7   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    250 Hudson Street, 8th Floor
8   New York, NY 10013-1413
    Telephone:  (212) 355-9500
9   Facsimile:  (212) 355-9592

10  Lowell Haky (State Bar No. 178526)
    Vice President and Associate General Counsel
11  Charles Schwab & Co., Inc.
    211 Main Street
12  San Francisco, CA  94105
    Telephone: (415) 667-0622
13  Facsimile: (415) 667-1638

14

15  *Attorneys for Plaintiffs*

16                   **UNITED STATES DISTRICT COURT**
17              **NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN FRANCISCO DIVISION**
18

                                              CV 11 4186

19  SCHWAB MONEY MARKET FUND;          Case No. _____
    SCHWAB VALUE ADVANTAGE
20  MONEY FUND;                        **COMPLAINT**
    SCHWAB RETIREMENT ADVANTAGE
21  MONEY FUND;
    SCHWAB INVESTOR MONEY FUND;        **JURY TRIAL DEMANDED**
22  SCHWAB CASH RESERVES;
    SCHWAB ADVISOR CASH RESERVES;
23  SCHWAB YIELDPLUS FUND; and
    SCHWAB YIELDPLUS FUND
24  LIQUIDATION TRUST,

25               Plaintiffs,

26  v.

27  BANK OF AMERICA CORPORATION;
    BANK OF AMERICA, N.A.; CREDIT
28

1   SUISSE GROUP AG; J.P.MORGAN
    CHASE & CO.; HSBC HOLDINGS PLC;
2   BARCLAYS BANK PLC; LLOYDS
    BANKING GROUP PLC; WESTLB AG;
3   UBS AG; ROYAL BANK OF
    SCOTLAND GROUP PLC; DEUTSCHE
4   BANK AG; CITIGROUP, INC.;
    CITIBANK, N.A.; DEUTSCHE BANK
5   SECURITIES; BANC OF AMERICA
    SECURITIES, LLC; CREDIT SUISSE
6   SECURITIES (USA) LLC.; UBS
    FINANCIAL SERVICES INC.; J.P.
7   MORGAN SECURITIES INC.;
    CITIGROUP GLOBAL MARKETS INC.;
8   CITIGROUP FUNDING, INC.; RBS
    SECURITIES INC. (F/K/A GREENWICH
9   CAPITAL MARKETS, INC.); BANK OF
    SCOTLAND PLC; CREDIT SUISSE
10  HOLDINGS (USA) INC;
    CHASE BANK USA;
11  JPMORGAN CHASE BANK NA;
    JP MORGAN SECURITIES LLC;
12  HSBC BANK USA;
    HSBC FINANCE CORPORATION;
13  HSBC SECURITIES (USA) INC;
    BARCLAYS US FUNDING CORP;
14  LLOYDS TSB BANK PLC;
    UBS FINANCE (DELAWARE) INC;
15  UBS FINANCIAL SERVICES INC;
    UBS SECURITIES LLC;
16  DEUTSCHE BANK FINANCIAL LLC;
    CITIZENS BANK, NA; CITIZENS BANK
17  OF MASSACHUSETTS; CITIZENS
    BANK OF PENNSYLVANIA; and RBS
18  CITIZENS, NA,

19              Defendants.

20

21          Plaintiffs Schwab Money Market Fund; Schwab Value Advantage Money Fund;

22  Schwab Retirement Advantage Money Fund; Schwab Investor Money Fund; Schwab Cash

23  Reserves; Schwab Advisor Cash Reserves, Schwab YieldPlus Fund, and  Schwab YieldPlus Fund

24  Liquidation Trust ("Plaintiffs"), by their counsel, allege as follows:

- 2 -                    COMPLAINT _____

## NATURE OF THE ACTION

1.     This case arises from ongoing manipulation of the London Interbank Offered Rate ("LIBOR") by a cadre of prominent financial institutions.  Beginning in 2007 and continuing approximately until the announcement of government investigations and subpoenas in March 2011 (the "Relevant Period"), Defendants (identified below) purported to report to the British Bankers' Association ("BBA") the actual interest rates they paid on funds they borrowed from other financial institutions—i.e., their true "costs of borrowing"—on a daily basis.  The BBA then relied on the false information Defendants provided to set LIBOR, a benchmark set of interest rates used to price trillions of dollars' worth of financial instruments worldwide.  By acting together and in concert to knowingly understate to the BBA their true costs of borrowing, Defendants caused LIBOR to be set artificially low.

2.     Defendants perpetrated their fraudulent scheme and conspiracy to artificially depress LIBOR as a means to pay lower interest rates on interest-bearing financial instruments and securities paying returns based on, tied to, benchmarked or indexed to LIBOR (collectively, "LIBOR-based instruments and securities") that Defendants sold to investors, including Plaintiffs. Specifically, Defendants misrepresented, in connection with numerous offerings of LIBOR-based instruments and securities during the Relevant Period, that the interest rates investors would receive on the subject LIBOR-based instruments and securities were based on LIBOR, when in fact Defendants were actively working together to ensure LIBOR was set at artificially low rates. Thus surreptitiously bilking investors of their rightful rates of return on their investments, Defendants reaped hundreds of millions, if not billions, of dollars in ill-gotten gains. Defendants—in the debt securities context, the borrowers—have been cheating investors—the lenders—out of interest payments for years.  Moreover, by understating their true costs of borrowing, Defendants provided a false or misleading impression of their financial strength to investors.

3.     Defendants' manipulation similarly depressed returns on securities they sold and issued that paid a fixed rate of return, such as fixed-rate notes.  As Defendants know, market

- 3 -

COMPLAINT _____

1   participants use LIBOR as the starting point for negotiating rates of return on short-term fixed-

2   rate instruments, such as fixed-rate notes maturing in a year or less.  Defendants borrowed money

3   from Plaintiffs by issuing short-term paper at a rate set as a spread above LIBOR.  By depressing

4   LIBOR, Defendants paid lower interest rates on short-term paper Plaintiffs purchased from them.

5   Additionally, by depressing LIBOR, Defendants depressed the rates of return Plaintiffs earned on

6   short-term paper they purchased from other entities who based those rates on LIBOR.

7          4.      While Defendants successfully perpetrated their unlawful scheme for years (amid

8   isolated expressions of concern by some market participants), a series of recently initiated

9   government investigations within the United States and abroad has begun to shed light on

10  Defendants' malfeasance.  Among other things, UBS recently disclosed that it received a grant of

11  conditional leniency from the United States Department of Justice ("DOJ") under the Antitrust

12  Criminal Penalties Enhancement and Reform Act and the DOJ's Corporate Leniency Policy in

13  exchange for cooperating with the DOJ's investigation into LIBOR manipulation.  Under that

14  policy, the DOJ only grants leniency to corporations that report *actual illegal activity*.  Other

15  Defendants likewise are targets of government investigations concerning the misconduct alleged

16  in this Complaint.

17         5.      During the Relevant Period, Plaintiffs acquired tens of billions of dollars' worth of

18  LIBOR-based instruments and securities from Defendants and other issuers, which paid

19  artificially low returns to Plaintiffs based on Defendants' manipulation of LIBOR.

20         6.      Plaintiffs now seek relief for the damages they have suffered as a result of

21  Defendants' violations of federal and state law.  Plaintiffs assert claims under the Sherman Act,

22  15 U.S.C. §§ 1 *et seq.*; the Clayton Act, 15 U.S.C. §§ 12 *et seq.*; the Securities Act of 1933

23  ("Securities Act"), 15 U.S.C. § 77k; the Securities Exchange Act of 1934 ("Exchange Act"), 15

24  U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the United States Securities and

25  Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5; the federal Racketeer Influenced and

26  Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*; and the statutory and common

27  law of California.  Plaintiffs' allegations are based on personal knowledge with respect to their

28  own conduct and on information and belief as to other allegations based on facts obtained during

934969.1                                                        COMPLAINT _____

1    the course of their attorneys' investigation.

2                              **JURISDICTION AND VENUE**

3        7.       This Court has jurisdiction over the subject matter of this action under Sections 4

4    and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26(a); Section 27 of the Exchange Act, 15 U.S.C. §

5    78aa; Section 22 of the Securities Act, 15 U.S.C. § 77v; and 28 U.S.C. §§ 1331 and 1337. The

6    Court may exercise supplemental jurisdiction, in accordance with 28 U.S.C. § 1367, over

7    Plaintiffs' state-law claims.

8        8.       This Court has personal jurisdiction over all of the Defendants by virtue of their

9    business activities in this jurisdiction.

10       9.       Venue is proper in the Northern District of California under Section 27 of the

11   Exchange Act, 15 U.S.C. § 78aa; Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 1965

12   of RICO, 18 U.S.C. § 1965; and 28 U.S.C. § 1391(b), (c) and (d). Each Defendant transacted

13   business in this District and a substantial part of the events or omissions giving rise to Plaintiffs'

14   claims occurred in this District. Defendants' unlawful conduct manipulated the prices of LIBOR-

15   based instruments and securities traded in this District.

16                                  **THE PARTIES**

17   **PLAINTIFFS**

18       10.      Schwab Money Market Fund is a series of The Charles Schwab Family of Funds,

19   an open-end investment management company organized as a Massachusetts business trust on

20   October 20, 1989. During the relevant period Schwab Money Market Fund bought notes and

21   other securities that paid a return or were priced off of LIBOR and was accordingly damaged by

22   defendants' wrongful conduct.

23       11.      Schwab Value Advantage Money Fund is a series of The Charles Schwab Family

24   of Funds, an open-end investment management company organized as a Massachusetts business

25   trust on October 20, 1989. During the relevant period Schwab Value Advantage Money Fund

26   bought notes and other securities that paid a return or were priced off of LIBOR and was

27   accordingly damaged by defendants' wrongful conduct.

28       12.      Schwab Retirement Advantage Money Fund is a series of The Charles Schwab

                                        - 5 -                    COMPLAINT _____

1    Family of Funds, an open-end investment management company organized as a Massachusetts

2    business trust on October 20, 1989. During the relevant period Schwab Retirement Advantage

3    Money Fund bought notes and other securities that paid a return or were priced off of LIBOR and

4    was accordingly damaged by defendants' wrongful conduct.

5         13.    Schwab Investor Money Fund is a series of The Charles Schwab Family of Funds,

6    an open-end investment management company organized as a Massachusetts business trust on

7    October 20, 1989. During the relevant period Schwab Investor Money Fund bought notes and

8    other securities that paid a return or were priced off of LIBOR and was accordingly damaged by

9    defendants' wrongful conduct.

10        14.    Schwab Cash Reserves is a series of The Charles Schwab Family of Funds, an

11   open-end investment management company organized as a Massachusetts business trust on

12   October 20, 1989. During the relevant period Schwab Cash Reserves bought notes and other

13   securities that paid a return or were priced off of LIBOR and was accordingly damaged by

14   defendants' wrongful conduct.

15        15.    Schwab Advisor Cash Reserves is a series of The Charles Schwab Family of

16   Funds, an open-end investment management company organized as a Massachusetts business

17   trust on October 20, 1989. During the relevant period Schwab Advisor Cash Reserves bought

18   notes and other securities that paid a return or were priced off of LIBOR and was accordingly

19   damaged by defendants' wrongful conduct.

20        16.    Schwab YieldPlus Fund is a series of Schwab Investments, an open-end

21   investment management company organized as a Massachusetts business trust on October 26,

22   1990. Contingent interests of Schwab YieldPlus Fund have passed to Schwab YieldPlus Fund

23   Liquidation Trust. During the relevant period Schwab YieldPlus Fund bought notes and other

24   securities that paid a return or were priced off of LIBOR and was accordingly damaged by

25   defendants' wrongful conduct.

26

27

28

934969.1                                                                    COMPLAINT _____

**DEFENDANTS**

A.    **LIBOR Panel Members**

17.    Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.

18.    Defendant Bank of America, N.A., is a national banking association incorporated in North Carolina and with its principal place of business in Charlotte, North Carolina.  It is a wholly-owned subsidiary of NB Holdings Corporation, which in turn is wholly-owned by Defendant Bank of America Corporation.  Defendants Bank of America, N.A. and Bank of America Corporation are collectively referred to as "Bank of America."

19.    Defendant Credit Suisse Group AG is a Swiss company headquartered in Zurich, Switzerland.

20.    Defendant J.P. Morgan Chase & Co. is a Delaware financial holding company headquartered in New York, New York.

21.    Defendant HSBC Holdings plc is a British public limited company headquartered in London, England.

22.    Defendant Barclays Bank plc is a British public limited company headquartered in London, England.

23.    Defendant Lloyds Banking Group plc is a British public limited company headquartered in London, England.  Lloyds was formed in 2009 through the acquisition of HBOS plc by Lloyds TSB Bank plc.

24.    Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany.

25.    Defendant UBS AG is a Swiss company based in Basel and Zurich, Switzerland.

26.    Defendant Royal Bank of Scotland Group plc is a British public limited company headquartered in Edinburgh, Scotland.

27.    Defendant Deutsche Bank, AG is a German financial services company headquartered in Frankfurt, Germany.

28.    Defendant Citibank, N.A. is a wholly-owned subsidiary of Defendant Citigroup,

COMPLAINT _____

934969.1

1    Inc., a United States financial services corporation headquartered in New York, New York.

2    Defendants Citibank, N.A., and Citigroup, Inc., are collectively referred to as "Citibank."

3         29.     During the Relevant Period, each of the Defendants listed in paragraphs 13-24 was

4    a member of the BBA's U.S. Dollar LIBOR panel.  These Defendants are referred to collectively

5    as the "LIBOR Panel Defendants."

6         **B.**     **Affiliated Securities Dealers**

7         30.     Defendant Deutsche Bank Securities is a broker-dealer organized under Delaware

8    law and doing business in New York, New York.  It is a wholly-owned subsidiary of Defendant

9    Deutsche Bank AG.

10        31.     Defendant Banc of America Securities, LLC is a corporation organized under

11    Delaware law and a wholly-owned subsidiary of Defendant Bank of America Corporation.

12        32.     Defendant Barclays Capital Inc. is a corporation organized under Connecticut law

13    and doing business in New York, New York.  It is a division of Defendant Barclays plc.

14        33.     Defendant Credit Suisse Securities (USA) LLC is a corporation organized under

15    Delaware law and doing business in New York, New York.

16        34.     Defendant UBS Financial Services Inc. is a corporation organized under Delaware

17    law doing business in Weehawken, New Jersey.

18        35.     Defendant J.P. Morgan Securities Inc., f/k/a Bear Stearns & Co., is a corporation

19    organized under Delaware law and a wholly-owned subsidiary of Defendant JP Morgan Chase

20    Bank, N.A.

21        36.     Defendant Citigroup Global Markets Inc. is a broker-dealer New York corporation

22    organized under New York law.  It is a subsidiary of Defendant Citigroup, Inc.

23        37.     Defendant Citigroup Funding, Inc. is a corporation organized under Delaware law.

24    It is a subsidiary of Defendant Citigroup, Inc.

25        38.     Defendant RBS Securities, Inc., (f/k/a Greenwich Capital Markets, Inc.) is a

26    corporation organized under Delaware law doing business in Connecticut.  It is a subsidiary of

27    Defendant Royal Bank of Scotland Group plc.

28        39.     Defendant Bank of Scotland plc is a bank organized under U.K. law, based in

934969.1                               COMPLAINT _____

1    Edinburgh. It is a subsidiary of Defendant Lloyds Banking Group plc.

2         40.    Defendant Credit Suisse Holdings (USA) Inc is a corporation organized under

3    Delaware law and doing business in New York, New York. It is a subsidiary of Defendant Credit

4    Suisse Group AG.

5         41.    Defendant Chase Bank USA, N.A. is a national banking association incorporated

6    in Delaware, with its principal place of business in Newark, Delaware, and is a wholly-owned

7    subsidiary of Defendant JPMorgan Chase & Co.

8         42.    Defendant JPMorgan Chase Bank NA s a corporation organized under Delaware

9    law and a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.

10        43.    Defendant JP Morgan Securities LLC is a corporation organized under Delaware

11   law and a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.

12        44.    Defendant HSBC Bank USA, N.A. is the principal subsidiary of HSBC USA Inc.,

13   an indirect, wholly-owned subsidiary of HSBC North America Holdings Inc.

14        45.    Defendant HSBC Finance Corporation is a subsidiary of HSBC North America

15   Holdings Inc., owned by HSBC Holdings plc, the parent company of the HSBC Group. HSBC

16   Finance Corporation is headquartered in London, England.

17        46.    Defendant HSBC Securities (USA) Inc is a corporation organized under the laws

18   of Delaware, with its principal place of business in New York, New York, and is a subsidiary of

19   HSBC North America Holdings, Inc.

20        47.    Barclays US Funding LLC, formerly known as Barclays U.S. Funding

21   Corporation, is a corporation organized under Delaware law and doing business in New York,

22   New York.

23        48.    Defendant Lloyds TSB Bank PLC is a British public limited company

24   headquartered in London, England. It is a subsidiary of Defendant Lloyds Banking Group plc.

25        49.    Defendant UBS Finance (Delaware) Inc. is a corporation organized under

26   Delaware law doing business in New York, New York. It is a wholly-owned subsidiary of

27   Defendant UBS AG.

28        50.    Defendant UBS Securities LLC (f/k/a USB Warburg LLC) is a corporation

1 | organized under Delaware law doing business in Connecticut. It is a wholly-owned subsidiary of
2 | Defendant UBS AG.

3 |       51.     Defendant Deutsche Bank Financial LLC is a limited liability company organized
4 | under Delaware law. It is a subsidiary of Defendant Deutsche Bank, AG.

5 |       52.     Defendant Citizens Bank, NA is a national banking association organized under
6 | Rhode Island Law doing business in Rhode Island. It is a subsidiary of Citizens Financial Group,
7 | Inc., a wholly-owned subsidiary of Defendant Royal Bank of Scotland Group plc.

8 |       53.     Defendant Citizens Bank of Massachusetts was merged into and subsequently
9 | operated as part of RBS Citizens, National Association in Providence, Rhode Island.

10 |       54.     Defendant Citizens Bank of Pennsylvania is a national banking association
11 | organized under the laws of Pennsylvania and headquartered in Philadelphia, Pennsylvania. It is
12 | a subsidiary of Citizens Financial Group, Inc. a wholly-owned subsidiary of Defendant Royal
13 | Bank of Scotland Group plc.

14 |       55.     Defendant RBS Citizens, NA, formerly known as Citizens Bank of Massachusetts,
15 | is a national banking association organized under the laws of Maryland and headquartered in
16 | Providence, Rhode Island.

17 |       56.     The entities identified in paragraphs 27-52 are referred to collectively as the
18 | "Securities Dealer Defendants."

19 |       57.     Each of the Securities Dealer Defendants joined and furthered the conspiracy by
20 | selling LIBOR-based instruments and securities at elevated prices and that paid depressed rates of
21 | interest as a result of the misconduct alleged herein, to the direct benefit of their corporate parents
22 | that manipulated LIBOR.

23 |       58.     The LIBOR Panel Defendants agreed to manipulate LIBOR on behalf of, and
24 | reported this manipulation to, their respective corporate families. As a result, the entire corporate
25 | family was represented in these meetings and discussions by their agents and were parties to the
26 | agreements reached in them. Furthermore, to the extent that subsidiaries or affiliates within the
27 | corporate families sold LIBOR-based instruments and securities to buyers such as Plaintiffs, these
28 | subsidiaries and affiliates played a significant role in the conspiracy. Thus, all entities within the

934969.1                           COMPLAINT _____

corporate families that were engaged in the setting of LIBOR or the marketing, sale and distribution of such LIBOR-based instruments and securities were active, knowing participants in the alleged conspiracy.

## FACTUAL ALLEGATIONS

**A.** **LIBOR Was The Touchstone Of The Represented Rates Of Return On The LIBOR-Based Instruments And Securities Plaintiffs And Other Investors Purchased During The Relevant Period.**

59.    LIBOR is a set of reference or benchmark interest rates priced to different ranges of maturity, from overnight to one year. Thomson/Reuters calculates LIBOR each business day on behalf of the BBA, which first began setting LIBOR on January 1, 1986. The BBA establishes LIBOR based on the rates 16 major international banks, including the LIBOR Panel Defendants, reported as their costs of borrowing. The banks inform the BBA of their costs of borrowing funds at different maturity dates (e.g., one month, three months, six months). The BBA discards the upper four and lower four quotes and sets LIBOR by calculating the mean value of the remaining middle eight quotes, known as an "inter-quartile" methodology. The BBA then publishes LIBOR, also reporting the quotes on which it based the LIBOR calculation.

60.    LIBOR serves a crucial role in the operation of financial markets. For example, market participants commonly set the interest rate on floating-rate notes as a spread against LIBOR (e.g., "LIBOR + [X] bps"). Market participants also use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate notes. Additionally, the pricing and settlement of Eurodollar futures and options, the most actively traded interest rate futures contracts on the Chicago Mercantile Exchange, are based on the three-month LIBOR. LIBOR thus affects the pricing of trillions of dollars' worth of financial transactions. As alleged below, Plaintiffs purchased tens of billions of dollars worth of LIBOR-based instruments and securities from Defendants and other issuers during the Relevant Period.

## B.    Defendants Manipulated LIBOR During The Relevant Period.

61.    Throughout the Relevant Period Defendants and other members of the U.S. dollar LIBOR panel conspired to suppress LIBOR below levels at which it would have been set had they accurately reported their costs of borrowing. As explained below, Defendants' scheme is

- 11 -

evidenced in the aberrant behavior of LIBOR and the rates the LIBOR Panel Defendants reported, which tended to "bunch" near the bottom quartile of the collection of reported rates used to set LIBOR and did not properly correlate with other simultaneous economic measures of Defendants' costs of borrowing, such as credit default swap ("CDS") insurance premiums and the Eurodollar Bid Rate.

### 1.   Defendants Commenced Their Scheme In 2007 And Perpetuated It Amid Isolated Expressions of Concern By Some Market Participants.

62.     In November 2007, a concern arose among some in the U.K. banking community that the members of the U.S. dollar LIBOR panel, including the LIBOR Panel Defendants, might be understating their true costs of borrowing, thus causing LIBOR to be set artificially low. Some U.K. banks raised their concerns at a meeting of the Bank of England that month.

63.     In response to those concerns, specifically "anecdotal evidence gathered from conversation with market participants ... that the rates quoted and paid by banks on their interbank borrowing tended to vary more than usual (and by more than what appears in the LIBOR panel) during the turbulence," the Bank for International Settlements ("BIS") in Spring 2008 produced a study of the U.S. dollar LIBOR ("USD-LIBOR"). Overnight-indexed swaps ("OIS") are viewed as virtually risk-free, so the positive difference between LIBOR and interest rates on those swaps should reflect the credit risk of the quoting banks. Specifically, the BIS examined two values: (i) the difference, or "spread," between USD-LIBOR and OIS; and (ii) the BIS compared the LIBOR-OIS spread to the cost of CDS insurance on the debt of the BBA panel banks. Absent manipulation, those two values should exhibit a stable relationship, because they both depend on the same thing: the credit risk of the quoting banks.

64.     Contrary to that expectation, the BIS found an unusually "loose" relationship between CDS premiums and the LIBOR-OIS spread, beginning in August 2007 and continuing at least into 2008, when the BIS published its findings. During that time, CDS premiums led the LIBOR-OIS spread in an upward trend. In other words, the cost of CDS insurance on the debt of the panel banks increased more swiftly than the difference between LIBOR and interest rates on OIS, when the two values should have behaved similarly.

934969.1

65.     On May 29, 2008, <u>The Wall Street Journal</u> published the results of a study it had commissioned comparing the quotes of LIBOR panel banks with the contemporaneous cost of buying default insurance (i.e., a CDS) on the banks' debt.[1]  The <u>Journal</u> found that beginning in January 2008, "the two measures began to diverge, with reported LIBOR rates failing to reflect rising default-insurance costs."  The <u>Journal</u> further found that the widest gaps existed with respect to the LIBOR quotes of Citibank, WestLB, HBOS, JP Morgan and UBS.

66.     The <u>Journal</u> also compared the banks' LIBOR quotes to their actual costs of borrowing in the commercial paper market.  The <u>Journal</u> reported, for example, that in mid-April 2008, UBS paid 2.85% to borrow dollars for three months; but on April 16, 2008, UBS reported a borrowing cost of 2.73% to the BBA as its LIBOR reference quote.

67.     The <u>Journal</u> further reported an uncanny equivalence between the banks' LIBOR quotes:  the three-month borrowing rates the banks reported remained within a range of only 0.06 of a percentage point, even though at the time their CDS insurance costs (premiums) varied much more widely, reflecting the market's differing views as to the banks' creditworthiness.  The <u>Journal</u> quoted Stanford University professor Darrell Duffie, who described the unity of the banks' LIBOR quotes as "far too similar to be believed."  Calculating an alternate borrowing rate incorporating CDS spreads the <u>Journal</u> estimated that underreporting of LIBOR had a $45 billion effect on the market, representing the amount borrowers (the banks) did not pay to lenders (investors in debt securities issued by the banks) that they would otherwise have had to pay.

68.     In May 2008, following the <u>Journal</u>'s reports, Tim Bond, the head of asset-allocation research at Barclays, admitted "the rates the banks were posting to the BBA became a little divorced from reality" during 2007-2008, adding:

> We had one week in September where our treasurer, who takes his responsibilities pretty seriously, said, "Right, I've had enough of this, I'm going to quote the right rates".  All we got for our pains was a series of media articles saying that we were having difficulty financing.[2]

---

[1] Mollenkamp & Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for LIBOR," <u>The Wall Street Journal</u>, May 29, 2008.
[2] http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/2790833/Libor-credibility-questioned-by-Barclays-strategist.html.

COMPLAINT _____

934969.1

69.     In a report published mid-April 2008 entitled "Is LIBOR Broken?", Citibank's Scott Peng, an interest rate analyst, wrote "Libor at times no longer represents the level at which banks extend loans to others." He concluded that LIBOR was suppressed by 30 basis points ("bps").[3] Peng resigned approximately one year later. Reports of his resignation referenced his disclosures about LIBOR. On April 18, 2008, Credit Suisse's William Porter, a credit strategist, estimated an even greater suppression:  40 bps (as reported that day by the Journal).

70.     On April 3, 2008, the Bank of England money-market committee held a meeting of U.K. banks. The minutes of that meeting state: "U.S. Dollar Libor rates had at times appeared lower than actual traded interbank rates."

71.     Right after the Journal's original April 16, 2008 article, the LIBOR panel banks raised their quotes, causing LIBOR to log its biggest increase since August 2007, falsely and misleadingly signaling that any improper reporting of false rates that may have previously occurred had ended.

### 2.     **The Discrepancy Between Defendants' Reported LIBOR Quotes And Their CDS Spreads Evinces Defendants' Improper Scheme.**

72.     Despite the reporting in 2008 described above, the LIBOR Panel Defendants continued to give LIBOR quotes that in fact deviated from their costs of borrowing as reflected in CDS spreads. Citibank, for example, reported rates virtually identical to those of the Bank of Tokyo-Mitsubishi, another U.S. dollar LIBOR panel member, even though the banks had vastly different costs of borrowing, as implied by the respective costs of CDS insurance on their debt.

---

[3] 100 basis points equal 1%.

- 14 -

COMPLAINT





73.     Indeed, during much of 2009, Citibank's panel quote was, anomalously, *lower* than the premiums on its CDS, which if true would mean anyone lending to Citibank at interbank rates would, after purchasing CDS insurance, incur a 5% *loss*.  That discrepancy contravenes basic rules of economics and finance, thus indicating that Citibank underreported its borrowing costs to the BBA.

### 3.     Deviations Among Banks Participating In The Same Currencies Indicates That Defendants Manipulated LIBOR.

74.     The LIBOR Panel Defendants' reported rates also displayed inexplicable ranking anomalies.  Specifically, the LIBOR Panel Defendants reported lower rates on USD-LIBOR than did their colleagues on the panel, yet, for other currencies, provided higher rates than did those same other banks.  Both Bank of America and Bank of Tokyo, for instance, quoted rates for the USD-LIBOR and Yen-LIBOR during the period under study, yet Bank of America quoted a lower rate than Bank of Tokyo on USD LIBOR and a *higher* rate than Bank of Tokyo on Yen-LIBOR.  Other banks suspected of rate manipulation displayed similar anomalies across currencies, as the graphs below demonstrate.  Citibank, for example, often reported rates at the top of the Yen-LIBOR scale while simultaneously quoting rates at the bottom of the USD-LIBOR

934969.1                                                            COMPLAINT _____

1  scale. Those discrepancies make no economic sense: an enormous financial institution like

2  Citibank is not substantially more or less creditworthy for purposes of borrowing yen versus

3  dollars.



4.  **Quote-Bunching**

75.  The LIBOR Panel Defendants' LIBOR quotes also demonstrate anomalous

"bunching" around the fourth-lowest rate submitted by the 16 reference banks to the BBA every

day. As the graphs below demonstrate, during the Relevant Period the rates reported by the

LIBOR Panel Defendants tended to "bunch" around the fourth-lowest quote much more

commonly than the CDS spreads of the banks tended to "bunch" around the fourth-lowest spread.

That discrepancy defies common economic reasoning, which indicates that the distribution of

rates and CDS spreads should be the same or very similar. The rates reported by Citibank and

Bank of America, in particular, often tended to be identical to the fourth-lowest quote.



76.     Given the method by which the BBA calculates LIBOR—discarding the highest and lowest reported rates and averaging the remainder—that high concentration around the fourth-lowest rate is exactly what would occur if a number of banks sought in concert to depress LIBOR.

**5.     The Anomalous Eurodollar Bid Rate-LIBOR Spread Beginning After August 2007 Also Reflects Defendants' Scheme.**

77.     Defendants' conduct also caused LIBOR to break its historic—and economically dictated—relationship with the Eurodollar Bid Rate. "Eurodollars" are time-deposits for dollars located outside the United States. The "Eurodollar Bid Rate" is the rate of interest offered on such deposits. In other words, it is the rate offered to attract dollars, whereas LIBOR is, essentially, the rate asked of a party seeking dollars. Thus, before August 2007, the previous day's Eurodollar Bid Rate was closely aligned with, and was a good predictor of, LIBOR. The Eurodollar Bid Rate had usually tracked 6-12 bps below LIBOR, suggesting something like a bid-ask spread. Thus, if, hypothetically, the Eurodollar Bid Rate were 2.5%, one would expect LIBOR that same day to fall between 2.56% and 2.62%.

934969.1                                                        COMPLAINT _____

78.     After August 2007, however, that relationship broke down: the spread inverted, with LIBOR skewing lower than the Eurodollar Bid Rate by substantial amounts through 2009. The Eurodollar Bid Rate no longer predicted LIBOR; the prior-day's LIBOR became a much better predictor. An analysis of the Eurodollar Bid Rate over time implies that LIBOR continued to be understated by as much as 30-40 basis points through 2009.

79.     The following shows the breakdown of the relationship between the Eurodollar Bid Rate and LIBOR from 2007 to 2009.



C.      **Defendants Possessed Strong Incentives to Manipulate LIBOR.**

80.     Defendants each had a substantial financial incentive to manipulate LIBOR because each had billions of dollars in exposures to movements in interest rates. Citibank, Bank of America and JPMorgan, for instance, reported billions of dollars (notional) in interest rate swaps during the period under study; even a small unhedged exposure to interest rates would have had a substantial effect on revenues. Indeed, all three banks reported increased net interest revenues in the first quarter of 2009, when LIBOR fell dramatically. Similarly, in 2009 Citibank reported it would make $936 million in net interest revenue if rates would fall by 25 bps per quarter over the next year and $1.935 billion if they fell 1% instantaneously. JP Morgan also

934969.1                                                    COMPLAINT

reported significant exposure to interest rates in 2009: it predicted that if interest rates increased by 1%, it would lose over $500 million. HSBC and Lloyds also predicted they would earn hundreds of millions of additional dollars in 2008-2009 in response to lower interest rates, and lose comparable amounts in response to higher rates. These banks collectively earned billions in net interest revenues during the Relevant Period. Underreporting the banks' costs of borrowing also had the benefit of disguising the true risks to their solvency and liquidity during a time of economic crisis and intense political pressure.

**D.** **Defendants' Misconduct Has Incited Numerous Pending Government Investigations.**

81.     Numerous regulators, professional organizations, analysts and news agencies recently have begun investigating the LIBOR Panel Defendants' reported LIBOR rates.

82.     On March 15, 2011, UBS disclosed that it had received subpoenas from the SEC, the Commodity Futures Trading Commission ("CFTC") and the DOJ seeking information concerning "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times." UBS reported that the Japanese Financial Supervisory Agency also requested information relating to UBS's LIBOR self-reporting.

83.     On March 15, 2011, the *Financial Times* reported that the U.K.'s Financial Services Authority ("FSA") had requested similar information from UBS.

84.     The *Financial Times* also reported that Bank of America, Citibank and Barclays had received subpoenas from the FSA and that "[a]ll the [BBA] panel members are believed to have received at least an informal request for information[.]"

85.     Lloyds Banking Group, Barclays, and RBS have also disclosed that they are subjects of the FSA's investigation.

86.     On July 26, 2011, news sources reported that UBS had disclosed that it had received a grant of conditional leniency from the DOJ in exchange for cooperating with the DOJ's investigation into LIBOR manipulation. UBS has received conditional leniency pursuant to the Antitrust Criminal Penalties Enhancement and Reform Act and the DOJ's Corporate Leniency Policy. Under that policy, the DOJ only grants leniency to corporations that report actual illegal activity.

E.      **Plaintiffs Have Suffered Significant Harm As A Result of Defendants' Misconduct.**

87.     Throughout the Relevant Period, Defendants' manipulation of LIBOR caused damage to Plaintiffs. All told, Defendants' conduct affected the value of tens of billions of dollars in LIBOR-based instruments and securities Plaintiffs held or purchased. Most of those securities and instruments fell into one of the following categories.

88.     Floating-rate notes and other LIBOR-based instruments and securities sold or issued to Plaintiffs by Defendants. Throughout the Relevant Period, Plaintiffs bought floating-rate notes from and issued by Defendants. These notes paid a rate of return based on LIBOR. Defendants' suppression of LIBOR caused Plaintiffs to receive lower returns on these notes than they would have if LIBOR had been properly set. Plaintiffs relied on the accuracy of LIBOR in undertaking these transactions.

89.     Floating-rate notes and other LIBOR-based instruments and securities sold or issued to Plaintiffs by entities other than Defendants. Throughout the Relevant Period, Plaintiffs bought floating-rate notes from and issued by entities other than Defendants, e.g. short-term commercial paper. As is well-known to sophisticated market participants like Defendants, these notes are affected by, and pay returns based on, LIBOR. Defendants' suppression of LIBOR caused Plaintiffs to receive lower returns on these notes than they would have if LIBOR had been properly set. Plaintiffs relied on the accuracy of LIBOR in undertaking these transactions.

90.     Fixed-rate notes and other LIBOR-based instruments and securities sold or issued to Plaintiffs by Defendants. Throughout the Relevant Period, Plaintiffs bought fixed-rate notes from and issued by Defendants. These notes paid a fixed rate of return. However, the price of these notes and the fixed rate or return were determined based on LIBOR. Defendants' suppression of LIBOR caused Plaintiffs to receive lower returns on these notes and/or pay more for them than they would have if LIBOR had been properly set. Plaintiffs relied on the accuracy of LIBOR in undertaking these transactions.

91.     Fixed-rate notes and other LIBOR-based instruments and securities sold or issued to Plaintiffs by entities other than Defendants. Throughout the Relevant Period, Plaintiffs bought

COMPLAINT _____

1   fixed-rate notes from and issued by entities other than Defendants.  As is well-known to

2   sophisticated market participants like Defendants, these notes are priced off of, and pay returns

3   based on, LIBOR.  Defendants' suppression of LIBOR caused Plaintiffs to receive lower returns

4   on these notes than they would have if LIBOR had been properly set.

5                              **FRAUDULENT CONCEALMENT**

6           92.     Plaintiffs had neither actual nor constructive knowledge of the facts supporting

7   their claims for relief despite diligence in trying to discover the pertinent facts.  Plaintiffs did not

8   discover, and could not have discovered through the exercise of reasonable diligence, the

9   existence of the conspiracy alleged herein until 2011, when investigations by the DOJ and other

10  antitrust regulators became public.  Defendants engaged in a secret conspiracy that did not give

11  rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to manipulate

12  LIBOR.

13                                **CLAIMS FOR RELIEF**

14                              **FIRST CLAIM FOR RELIEF**

15          **Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

16
17          93.     Plaintiffs incorporate by reference and reallege the preceding allegations as though

18  fully set forth herein.

19          94.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of

20  trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

21          95.     During the Relevant Period, Defendants controlled what LIBOR rate would be

22  reported and therefore controlled prices in the market for securities and contracts paying returns

23  based on LIBOR.  Defendants competed in this market.

24          96.     The conspiracy consisted of a continuing agreement, understanding or concerted

25  action between and among Defendants and their co-conspirators in furtherance of which

26  Defendants fixed, maintained or made artificial prices for LIBOR-based instruments and

27  securities.  Defendants' conspiracy constitutes a *per se* violation of the federal antitrust laws and

28  is, in any event, an unreasonable and unlawful restraint of trade.

COMPLAINT _____

97.     Defendants' conspiracy, and the resulting impact on the market for LIBOR-based instruments and securities, occurred in and affected interstate and international commerce.

98.     As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

99.     Plaintiffs are entitled to treble damages for the violations of the Sherman Act alleged herein.

**SECOND CLAIM FOR RELIEF**

**Interference with Economic Advantage (under California Law)**

100.     Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

101.     As set forth in this Complaint, Defendants manipulated LIBOR in violation of federal and state law.

102.     An economic relationship existed between Plaintiffs and issuers of LIBOR-based instruments and securities, which obligated the issuers to make payments to Plaintiffs at a rate dependent on LIBOR.

103.     Defendants' unlawful manipulation of LIBOR interfered with and disrupted that relationship by defeating the parties' expectations that LIBOR would be set honestly and accurately and would provide a fair benchmark for those securities.  As a result, Plaintiffs received lower payments on those securities than they otherwise would have, and overpaid for the securities, and were damaged thereby.

104.     Defendants acted with the knowledge that interference or disruption of Plaintiffs' relationships with issuers of securities indexed to LIBOR were certain or substantially certain to result from Defendants' unlawful manipulation of LIBOR.

**THIRD CLAIM FOR RELIEF**

**Violation of Section 17200 of the California Business and Professions Code (Unfair Business Practices)**

105.     Defendants have engaged in fraudulent, unfair and illegal conduct in violation of Section 17200 of the California Business and Professions Code ("Section 17200").  Defendants'

COMPLAINT _____

934969.1

1    conduct was substantially injurious to Plaintiffs.

2        106.    Defendants' business acts and practices, as alleged herein, constituted—and still

3    constitute—a continuous course of unfair competition by means of unfair, unlawful or fraudulent

4    business acts or practices in violation of Section 17200, including the following:

5            a.    the violations of the antitrust, securities, wire fraud, mail fraud, bank fraud,

6                racketeering and other laws as set forth herein;

7            b.    Defendants' unfair business acts and practices, which induced investors, including

8                Plaintiffs, to purchase and retain the LIBOR-based instruments and securities

9                Defendants or others issued based on falsely-set LIBOR rates, and Defendants'

10               materially false and misleading statements about their costs of borrowing, made

11               with knowledge or reckless disregard that they were materially false or misleading

12               when made.

13       107.    Defendants' business acts and practices, as alleged herein, have caused Plaintiffs

14   to purchase and retain the subject LIBOR-based instruments and securities and, as a result, to

15   suffer losses.

16       108.    Plaintiffs are entitled to full relief, including full restitution or disgorgement of all

17   revenues, earnings, profits, compensation and benefits Defendants may have obtained as a result

18   of such business, acts or practices, and an injunction mandating that Defendants cease and desist

19   from engaging in the practices described herein.

20   ## FOURTH CLAIM FOR RELIEF

21   ## Fraud, Deceit and Concealment (under Sections 1572, 1709 and 1710 of the California Civil Code)

22       109.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

23   fully set forth herein.

24       110.    Plaintiffs purchased LIBOR-based instruments and securities issued by Defendants

25   and other entities.  Those included floating-rate notes where Defendants paid interest rates based

26   on LIBOR, and fixed-rate notes where the parties determined the fixed rate of interest by

27   referencing LIBOR.

28

- 23 -                COMPLAINT _____

934969.1

111.    Defendants made numerous statements to Plaintiffs to induce them to purchase those notes and other financial instruments.

112.    Contemporaneous with Plaintiffs' purchases, Defendants gave public quotes to the BBA of their supposed costs of borrowing.

113.    In fact, Defendants' quotes to the BBA did not reflect their true costs of borrowing but instead reflected Defendants' scheme to unlawfully manipulate LIBOR.

114.    Defendants never disclosed to Plaintiffs the inaccuracy of their quotes to the BBA or that Defendants had manipulated LIBOR to cause it to be lower than it should have been, and perpetrated an ongoing conspiracy to do so.

115.    The inaccuracy of Defendants' reported quotes and their scheme to manipulate LIBOR were material facts of which Plaintiffs were unaware. If Defendants had disclosed those facts, Plaintiffs would not have purchased the subject securities, or at least would have demanded appropriately higher interest rates on those securities. Plaintiffs relied on the accuracy of Defendants' quotes, on the accuracy of LIBOR, and on the other statements by Defendants that did not include these material omissions.

116.    Defendants' concealment of the inaccuracy of their reported quotes and their scheme to manipulate LIBOR damaged Plaintiffs because Plaintiffs received lower returns (via lower interest rates) than they would have had LIBOR been accurately and honestly set, or had Plaintiffs purchased securities not paying interest as a function of LIBOR.

## FIFTH CLAIM FOR RELIEF

### Violation of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k

117.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

118.    For purposes of this claim, Plaintiffs expressly disclaim and exclude any allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based expressly on claims of strict liability or negligence under the Securities Act.

119.    Plaintiffs bring this claim in connection with all LIBOR-based notes or other

934969.1

COMPLAINT _____

1    securities Plaintiffs purchased in offerings during the Relevant Period.

2        120.    Each Defendant filed registration statements and other related documents in

3    connection with each of the subject offerings.

4        121.    Those registration statements and other related documents contained materially

5    false statements of fact, or omitted to state facts necessary to make the statements therein not

6    misleading.  Specifically, the documents omitted to state that Defendants, as set forth above, had

7    manipulated LIBOR in a downward direction by providing inaccurate quotes to the BBA and that

8    Defendants perpetuated an ongoing scheme to continue their manipulation.  Moreover,

9    representations in the subject registration statements and related documents that the interest rates

10   for the subject securities would be based on LIBOR were false or misleading as a result of

11   Defendants' manipulation of LIBOR.  Thus references to "LIBOR" in those documents constitute

12   affirmative misstatements.

13       122.    None of the Defendants made a reasonable investigation or possessed reasonable

14   grounds to believe that the statements contained in the registration statements were true or that

15   there was no omission of material facts necessary to make the statements made therein not

16   misleading.

17       123.    By reason of the conduct herein alleged, each Defendant violated Section 11 of the

18   Securities Act.

19       124.    As a direct and proximate result of Defendants' acts and omissions in violation of

20   the Securities Act, the prices or values of the notes and other securities sold in the subject

21   offerings were artificially inflated, and Plaintiffs suffered substantial damage in connection with

22   their ownership of those securities.

23       125.    As issuers of the subject securities, each Defendant is strictly liable to Plaintiffs for

24   the material omissions identified above.

25       126.    Plaintiffs obtained the subject securities without knowledge of the facts concerning

26   the misstatements or omissions alleged herein.

27       127.    This action is brought within one year after discovery of the untrue statements and

28   omissions should have been made through the exercise of reasonable diligence, and within three

COMPLAINT _____

934969.1

1  years of the effective date of the subject registration statements.

2      128.    Plaintiffs are entitled to damages under Section 11 from each Defendant, as

3  measured by the provisions of Section 11(e).

4

5                          **SIXTH CLAIM FOR RELIEF**

6      **Violation of Section 12(a)(2) of the Securities Act of 1933**

7      129.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

8  fully set forth herein.

9      130.    For purposes of this claim, Plaintiffs expressly disclaim and exclude any

10  allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this

11  cause of action is based expressly on claims of strict liability or negligence under the Securities

12  Act.

13      131.    Defendants were sellers, offerors, underwriters or solicitors of sales of securities

14  issued by Defendants to Plaintiffs through prospectuses or oral communications during the

15  Relevant Period.

16      132.    The prospectuses or oral communications contained untrue statements of material

17  facts, omitted to state other facts necessary to make the statements made not misleading, and

18  concealed and failed to disclose material facts. Defendants' actions of solicitation included

19  participating in the preparation of the false and misleading prospectuses or oral communications.

20      133.    Defendants owed to the purchasers of the subject securities, including Plaintiffs,

21  the duty to make a reasonable and diligent investigation of the statements contained in the

22  prospectuses or oral communications, to insure that such statements were true and that there was

23  not omission to state a material fact required to be stated in order to make the statements

24  contained therein not misleading. Defendants knew of, or in the exercise of reasonable care

25  should have known of, the misstatements and omissions contained in the prospectuses or oral

26  communications, as set forth above.

27      134.    Plaintiffs purchased or otherwise acquired securities pursuant to or traceable to the

28  defective prospectuses or oral communications. Plaintiffs did not know, nor in the exercise of

934969.1                                                          COMPLAINT _____

reasonable diligence could have known, of the untruths and omissions.

135.    Plaintiffs hereby offer to tender to Defendants those securities Plaintiffs continue to own, in return for the considerations paid for those securities, together with interest thereon.

136.    By reason of the conduct alleged herein, Defendants violated, or controlled a person who violated, Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs have the right to rescind and recover the consideration paid for the subject securities and hereby elect to rescind and tender those securities to Defendants.  Plaintiffs are entitled to rescissionary damages with respect to those subject securities they have sold.

137.    Less than three years have elapsed from the time that the securities upon which this count is brought were sold to the public to the time of the filing of this action.  Less than one year has elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this count is based to the time of the filing of this action.

### SEVENTH CLAIM FOR RELIEF

### Violation of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o

138.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

139.    This cause of action is being brought under Section 15 of the Securities Act, 15 U.S.C. §77o, against the LIBOR Panel Defendants.  This Count is based solely on strict liability and negligence, and does not sound in fraud.  Any allegations of fraud or fraudulent conduct or motive are specifically excluded.  For purposes of asserting this and its other claims under the Securities Act, Plaintiffs do not allege that the LIBOR Panel Defendants acted with intentional, reckless or otherwise fraudulent intent.

140.    Each of the LIBOR Panel Defendants, by virtue of its position as a parent company or otherwise controlling entity of one or more of the Securities Dealer Defendants, was a control person of one or more of the Securities Dealer Defendants.

141.    As a result, the LIBOR Panel Defendants are liable under Section 15 of the Securities Act for the Securities Dealer Defendants' primary violations of Sections 11 or 12(a)(2)

934969.1                                                     COMPLAINT _____

of the Securities Act.

## EIGHTH CLAIM FOR RELIEF

### Violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Thereunder

142. Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

143. Beginning in 2007, Defendants carried out a plan, scheme and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase securities at artificially inflated prices. In furtherance of their unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

144. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit on the purchasers of the their securities in an effort to cause LIBOR to be set at an artificially low rate, which in turn allowed Defendants to pay lower interest rates on the notes and other securities Plaintiffs acquired from Defendants and other issuers, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

145. Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the manipulation of LIBOR as specified herein.

146. Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices and a course of conduct as alleged herein in an effort to secretly manipulate LIBOR, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make Defendants' statements during the Relevant Period— including their representations that the rates of the securities Defendants sold to Plaintiffs were based on LIBOR—in the light of the circumstances under which they were made, not misleading,

- 28 -

COMPLAINT _____

as set forth more particularly herein. Moreover, Defendants engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of the subject securities during the Relevant Period, including Plaintiffs.

147. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to Defendants. Defendants perpetrated such material misrepresentations or omissions knowingly or recklessly and for the purpose and effect of concealing Defendants' manipulation of LIBOR from the investing public, including Plaintiffs, and allowing Defendants to reap improper gains by failing to pay to Plaintiffs the true (higher) rates on the subject securities.

148. As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, as set forth above, Defendants caused LIBOR to be artificially low during the Relevant Period. The artificially depressed LIBOR rates caused the interest rates on the subject securities (which were based on the artificially low LIBOR rates) to be correspondingly, and artificially, low, which deprived Plaintiffs of returns they otherwise would have realized on those securities. In ignorance of those facts, and reasonably relying directly or indirectly on Defendants' false and misleading statements, or on the integrity of the market in which the securities traded, or on the absence of material adverse information that Defendants knew or recklessly disregarded but was not disclosed by Defendants during the Relevant Period, Plaintiffs acquired notes and other LIBOR-based securities during the Relevant Period and received lower payments on those securities than they otherwise would have.

149. At the time of said misrepresentations and omissions, Plaintiffs were unaware the misrepresentations and omissions were false or misleading, and believed them to be true. Had Plaintiffs known the truth regarding Defendants' manipulation of LIBOR, which Defendants did not disclose, Plaintiffs would not have purchased or otherwise acquired the subject securities, or at least would have demanded appropriately higher interest rates on those securities.

150. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the subject securities during the Relevant

COMPLAINT _____

1   Period.

2       151.   This action was filed within two years of discovery of the facts constituting the

3   violation and within five years of the violation.

4

5   ### NINTH CLAIM FOR RELIEF

6   ### Violation of Section 20(a) of the Securities Exchange Act of 1934

7       152.   Plaintiffs incorporate by reference and reallege the preceding allegations as though

8   fully set forth herein.

9       153.   The LIBOR Panel Defendants acted as controlling persons of the Securities Dealer

10  Defendants within the meaning of Section 20(a) of the Exchange Act as alleged herein.  Each of

11  the LIBOR Panel Defendants, by virtue of its position as a parent company or otherwise

12  controlling entity of one or more of the Securities Dealer Defendants, was a control person of one

13  or more of the Securities Dealer Defendants, possessing the power and authority to cause one or

14  more of the Securities Dealer Defendants to engage in the wrongful conduct complained of

15  herein.  The LIBOR Panel Defendants were provided with or had unlimited access to copies of

16  the statements alleged by Plaintiffs to be misleading prior to and/or shortly after those statements

17  were issued and had the ability to prevent the issuance of the statements or cause the statements to

18  be corrected.

19      154.   As set forth above, the Securities Dealer Defendants (as well as the LIBOR Panel

20  Defendants) each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in

21  this Complaint.  By reason of such conduct, the LIBOR Panel Defendants are liable under Section

22  20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct,

23  Plaintiffs suffered damages in connection with their purchases of the subject securities during the

24  Relevant Period.

25

26

27

28

COMPLAINT _____

934969.1

## TENTH CLAIM FOR RELIEF

### Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*

155.     Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

### Defendants Engaged In Conduct Actionable Under RICO.

156.     18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

157.     18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

158.     Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to financial institution fraud).

159.     18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

160.     18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

161.     18 U.S.C. § 1341, the mail fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, makes it unlawful to have "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

934969.1                                            COMPLAINT

representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

162.    18 U.S.C. § 1343, the wire fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

163.    18 U.S.C. § 1344, the federal bank fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, states:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice –
>
> 1.      to defraud a financial institution, or
>
> 2.      to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises shall be fined not more than $1,000,000 or imprisoned for not more than 30 years, or both.

- 32 -

COMPLAINT

164. At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including by communicating false interest rate quotes to the BBA or directing other employees to do so) were "person[s]" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and a hierarchy of corporate direction and control.

165. At all relevant times, Plaintiffs were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

### Defendants Formed A RICO Enterprise.

166. Defendants' collective association, including through the LIBOR Panel Defendants' participation together as members of the BBA's U.S. Dollar LIBOR panel, constitutes the RICO enterprise in this case. Every member of the enterprise participated in the process of misrepresenting their costs of borrowing to the BBA. Using those false quotes to cause the BBA to set LIBOR artificially low, thereby allowing Defendants to increase their net interest revenues by making artificially low payments to investors such as Plaintiffs, constitutes the common purpose of the enterprise.

### The Enterprise Has Perpetrated A Continuing Practice Of Racketeering.

167. For at least four years before this Complaint was filed, Defendants, in concert, made false statements to the BBA for the purpose and with the effect of manipulating LIBOR to be lower than it otherwise would have been. Defendants did so for the purpose and with the effect of decreasing their payments to investors such as Plaintiffs and increasing their net interest revenues. Defendants earned hundreds of millions, if not billions, of dollars in wrongful profits as a result, which they shared with the employees who perpetrated the scheme. The conduct of every party involved in the scheme is hardly an isolated occurrence that resulted in one fraudulent charge.

168. In perpetrating the fraudulent scheme, each Defendant directly or indirectly through its corporate structure has designed and implemented a uniform scheme to manipulate LIBOR. Defendants' daily making and communicating of quotes to the BBA comprise one common, uniform nearly identical system of procedures used in virtually an identical way every day.

- 33 -

COMPLAINT _____

934969.1

169.    For at least the past four years, Defendants have knowingly, intentionally or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. § 1343, and bank fraud within the meaning of 18 U.S.C. § 1344(2), by knowingly and intentionally implementing the scheme to make false statements about their costs of borrowing, to manipulate LIBOR, which allowed Defendants to reap unlawful profits.

170.    Defendants have committed the predicate act of mail fraud under 18 U.S.C. § 1341, thus triggering Section 1962(c) liability, by devising or intending to "devise a scheme or artifice to defraud" purchasers and holders of notes and other securities, and "for the purpose of executing such scheme or artifice or attempting so to do," placed or knowingly caused to be placed in a post office or authorized depository for mail matter, documents or packages to be sent or delivered by the Postal Service or a private or commercial interstate carrier, or received from those entities such documents or packages, including: (i) documents offering for sale notes and other securities and (ii) correspondence regarding offerings of notes and other securities (the conduct described in this paragraph is referred to as the "Mail Fraud").

171.    On information and belief, the Mail Fraud is the result of Defendants "having devised or intended to devise a scheme or artifice to defraud" holders of notes and other securities, for the purpose of obtaining money from those holders of notes and other securities through "false or fraudulent pretenses, representations, or promises."

172.    By devising the scheme or artifice to defraud consumers as described herein, and for obtaining money from holders of notes and other securities through "false or fraudulent pretenses, representations, or promises" about LIBOR-based notes and other securities, Defendants transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce, . . . writings, signs, signals, [and] pictures," "for the purpose of executing such scheme or artifice," including by: (i) transmitting documents offering notes and other securities for sale; (ii) transmitting phony statements about their costs of borrowing; (iii) transmitting e-mail communications relating to the process of determining, making or

COMPLAINT

1  transmitting phony statements about their borrowing costs; (iv) collecting funds from Plaintiffs

2  via electronic fund transfers or electronic communication with Plaintiffs' bank or credit card

3  institution; or (v) transmitting payments to Plaintiffs.

4       173.    In addition to that conduct, Plaintiffs are informed and believe Defendants used the

5  mails and wires in conjunction with reaching their agreement to make false statements about their

6  costs of borrowing, to manipulate LIBOR.

7       174.    Plaintiffs do not base their RICO claims on any conduct that would have been

8  actionable as fraud in the purchase or sale of securities.

9  **The Racketeering Scheme Affected Interstate Commerce.**

10       175.    Through the racketeering scheme described above, Defendants used the enterprise

11  to improperly increase their profits to the detriment of holders of notes and other securities, who

12  resided in different states.

13       176.    Plaintiffs' allegations satisfy RICO's "interstate commerce" element because the

14  racketeering claims alleged herein arise out of, and are based on, Defendants' use of the Internet

15  or the mails across state lines as well as agreements between entities in different states to

16  manipulate LIBOR. Using those interstate channels to coordinate the scheme and transmit

17  fraudulent statements to Plaintiffs across state lines satisfies RICO's requirement of an effect on

18  interstate commerce.

19  **Defendants Conspired To Violate RICO.**

20       177.    Apart from constructing and carrying out the racketeering scheme detailed above,

21  Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C.

22  § 1962(d).

23       178.    The fraudulent scheme, as set forth above, alleges a violation of RICO in and of

24  itself.

25       179.    Defendants organized and implemented the scheme, and ensured it continued

26  uninterrupted by concealing their manipulation of LIBOR from investors, including Plaintiffs.

27       180.    Defendants knew the scheme would defraud purchasers and holders of notes and

28  other securities of millions of dollars of interest, yet each Defendant remained a participant

- 35 -

COMPLAINT

1    despite the fraudulent nature of the enterprise.  At any point while the scheme has been in place,

2    any of the participants could have ended the scheme by abandoning the conspiracy and notifying

3    the public and law enforcement authorities of its existence.  Rather than stopping the scheme,

4    however, the members of the enterprise deliberately chose to continue it, to the direct detriment of

5    investors such as Plaintiffs.

6              **Plaintiffs Suffered Injury Resulting From The Pattern of Racketeering Activity.**

7              181.    Because Plaintiffs unknowingly paid money to Defendants for notes and other

8    securities that paid interest at a manipulated rate, and in fact collected less interest than they

9    would have absent the conspiracy, Plaintiffs are direct victims of Defendants' wrongful and

10   unlawful conduct.  Plaintiffs' injuries were direct, proximate, foreseeable and natural

11   consequences of Defendants' conspiracy; indeed, those effects were precisely why the scheme

12   was concocted.  In making payments to Defendants, Plaintiffs gave money in the custody or

13   control of financial institutions.  There are no independent factors that account for Plaintiffs'

14   economic injuries, and the loss of money satisfies RICO's injury requirement.

15             182.    The pattern of racketeering activity, as described in this Complaint, is continuous,

16   ongoing and will continue unless Defendants are enjoined from continuing their racketeering

17   practices.  Defendants have consistently demonstrated their unwillingness to discontinue the

18   illegal practices described herein, and they continue their pattern of racketeering as of the filing of

19   this Complaint.

20             183.    Plaintiffs are entitled to recover treble damages for the injuries they have

21   sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys'

22   fees in accordance with 18 U.S.C. § 1964(c).

23             184.    As a direct and proximate result of the subject racketeering activities, Plaintiffs are

24   entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting

25   Defendants from further engaging in their unlawful conduct.

26

27

28

### ELEVENTH CLAIM FOR RELIEF

### Violation of Sections 25400 and 25401 of the California Corporations Code

185.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

186.    Defendants, and each of them, acting individually and through a scheme and conspiracy, directly and indirectly, induced Plaintiffs' purchase and retention of the subject LIBOR-based instruments and securities by circulating or disseminating, in or from California, information for the purpose of inducing Plaintiffs to purchase and hold LIBOR-based instruments and securities.  Defendants omitted to inform Plaintiffs that they were engaged in an ongoing scheme to suppress LIBOR that would cause any holder of the subject LIBOR-based instruments and securities to receive lower payments than it otherwise would.  Defendants knew their statements were false or misleading in light of the circumstances under which they were made.  Defendants intended that Plaintiffs would be misled and would purchase LIBOR-based instruments and securities based on false information.  Despite their knowledge, Defendants continued to make the misrepresentations to induce Plaintiffs to purchase LIBOR-based instruments and securities.

187.    Defendants, and each of them, are liable under Sections 25500 and 25501 of the California Corporations Code for willfully participating in acts or transactions in violation of Sections 25400 and 25401 of the Corporations Code or for knowingly providing substantial assistance to violations of Sections 25400 and 25401 in violation of Section 25403.  Defendants are therefore liable to Plaintiffs, who purchased LIBOR-based instruments and securities at a price affected by Defendants' acts, for damages sustained as a result of such violations.

188.    Under Section 25504 of the California Corporations Code, Defendants, and each of them, are also liable as control persons, officers, principals, employees, broker-dealers or agents who provided material aid to a person in violation of Section 25503.

189.    Plaintiffs are entitled to prejudgment interest at the legal rate on their economic damages.

934969.1                                                                COMPLAINT _____

## TWELFTH CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith (under California Law)

190.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

191.    Plaintiffs contracted to purchase from Defendants LIBOR-based instruments and securities.

192.    Plaintiffs performed all of their obligations under the applicable contracts.

193.    All conditions required for Defendants' performance of those contracts were satisfied.

194.    Defendants unfairly interfered with Plaintiffs' right to receive the benefits of the subject contracts by secretly manipulating LIBOR to be lower than it otherwise would have been, as alleged in the foregoing paragraphs of this Complaint.

195.    Plaintiffs received less interest and lower returns on the LIBOR-based instruments and securities than they would have absent Defendants' manipulation of LIBOR, and were therefore harmed.

## THIRTEENTH CLAIM FOR RELIEF

### Unjust Enrichment (under California Law)

196.    By means of their unlawful conduct set forth in this Complaint—including misrepresenting their costs of borrowing to the BBA to manipulate LIBOR—Defendants knowingly acted in an unfair, unconscionable and oppressive manner toward Plaintiffs.

197.    Through their unlawful conduct, Defendants knowingly received and retained wrongful benefits and funds from Plaintiffs.  Defendants thereby actd with conscious disregard for Plaintiffs' rights.

198.    As a result of their unlawful conduct, Defendants have realized substantial ill-gotten gains.  Defendants have unlawfully manipulated LIBOR at the expense of, and to the detriment of, Plaintiffs, and to Defendants' benefit and enrichment.

199.    Plaintiffs' detriment and Defendants' enrichment are traceable to, and resulted directly and proximately from, the conduct challenged in this Complaint.

COMPLAINT _____

934969.1

200. Under the common law doctrine of unjust enrichment, it is inequitable to permit Defendants to retain the benefits they received, and are still receiving, without justification, from their manipulation of LIBOR in an unfair, unconscionable and oppressive manner. Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

201. The financial benefits Defendants derived rightfully belong to Plaintiffs. The Court should compel Defendants to disgorge, in a common fund for Plaintiffs' benefit, all unlawful or inequitable proceeds Defendants received. The Court should impose a constructive trust upon all unlawful or inequitable sums Defendants received that are traceable to Plaintiffs.

202. Plaintiffs have no adequate remedy at law.

## FOURTEENTH CLAIM FOR RELIEF

### Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, et seq.

203. Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

204. Defendants entered into and engaged in an unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code section 16720.

205. During the Relevant Period, Defendants controlled what LIBOR rate would be reported and therefore controlled prices in the market for securities and contracts paying returns based on LIBOR. Defendants competed in this market.

206. The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained or made artificial prices for LIBOR-based instruments and securities. Defendants' conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

207. Defendants' conspiracy, and the resulting impact on the market for LIBOR-based instruments and securities, occurred in and affected interstate and international commerce.

934969.1                                                    COMPLAINT

208.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

209.    Accordingly, Plaintiffs seek three times their damages caused by Defendants' violations of the Cartwright Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of the Cartwright Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    That the Court enter an order declaring that Defendants' actions as set forth in this Complaint, and in other respects, violate the law;

(B)    That the Court enter judgment awarding Plaintiffs damages against Defendants for all economic, monetary, actual, consequential and compensatory damages Plaintiffs suffered as a result of Defendants' conduct, or rescission, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)    That the Court award Plaintiffs exemplary or punitive damages against Defendants to the extent allowable by law;

(D)    That the Court award Plaintiffs damages against Defendants for Defendants' violation of the federal antitrust laws and RICO in an amount to be trebled in accordance with those laws ;

(E)    That the Court issue an injunction prohibiting Defendants from continuing the misconduct alleged in this Complaint, including their ongoing manipulation of LIBOR;

(F)    That the Court order the disgorgement of the ill-gotten gains Defendants derived from their misconduct

(G)    That the Court award Plaintiffs restitution of all amounts they paid to Defendants as consideration for notes and other financial instruments affected by Defendants' misconduct;

(H)    That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses; and

934969.1

COMPLAINT _____

1   (I)  That the Court award such other and further relief as the Court may deem just and

2 proper.

3          **JURY DEMAND**

4   Plaintiffs respectfully demand a trial by jury of all issues so triable.

5

6 Dated: August 23, 2011

7        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

8

9        By:

10       Richard M. Heimann (State Bar No. 063607)
         Joseph R. Saveri (State Bar No. 130064)

11      Eric B. Fastiff (State Bar No. 182260)
         Brendan Glackin (State Bar No. 199643)

12      275 Battery Street, 29th Floor
         San Francisco, California  94111-3339

13      Telephone:  (415) 956-1000
         Facsimile:  (415) 956-1008

14
         Steven E. Fineman (State Bar No. 140335)

15      Michael J. Miarmi
         250 Hudson Street, 8th Floor

16      New York, New York  10013-1413
         Telephone:  (212) 355-9500

17      Facsimile: (212) 355-9592

18      Lowell Haky (State Bar No. 178526)
         Vice President and Associate General Counsel

19      THE CHARLES SCHWAB CORPORATION
         211 Main Street

20      San Francisco, California  94105
         Telephone: (415) 667-0622

21      Facsimile: (415) 667-1638

22      *Attorneys for Plaintiffs*

23

24

25

26

27

28

934969.1                  COMPLAINT

EXHIBIT B

1  Richard M. Heimann (State Bar No. 063607)
   Joseph R. Saveri (State Bar No. 130064)
2  Eric B. Fastiff (State Bar No. 182260)
   Brendan Glackin (State Bar No. 199643)
3  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
4  San Francisco, CA 94111-3339
   Telephone: (415) 956-1000
5  Facsimile: (415) 956-1008

6  Steven E. Fineman (State Bar No. 140335)
   Michael J. Miarmi
7  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   250 Hudson Street, 8th Floor
8  New York, NY 10013-1413
   Telephone: (212) 355-9500
9  Facsimile: (212) 355-9592

10 Lowell Haky (State Bar No. 178526)
   Vice President and Associate General Counsel
11 Charles Schwab & Co., Inc.
   211 Main Street
12 San Francisco, CA 94105
   Telephone: (415) 667-0622
13 Facsimile: (415) 667-1638

14

15 *Attorneys for Plaintiffs*

16

17

18

          **UNITED STATES DISTRICT COURT**
          **NORTHERN DISTRICT OF CALIFORNIA**
          **SAN FRANCISCO DIVISION**

19 CHARLES SCHWAB BANK, N.A.;          Case No.  CV 11 4187
   CHARLES SCHWAB & CO., INC.; and
20 THE CHARLES SCHWAB                   **COMPLAINT**
   CORPORATION,
21
              Plaintiffs,
22                                      **JURY TRIAL DEMANDED**
   v.
23
   BANK OF AMERICA CORPORATION;
24 BANK OF AMERICA, N.A.; CREDIT
   SUISSE GROUP AG; J.P.MORGAN
25 CHASE & CO.; HSBC HOLDINGS PLC;
   BARCLAYS BANK PLC; LLOYDS
26 BANKING GROUP PLC; WESTLB AG;
   UBS AG; ROYAL BANK OF
27 SCOTLAND GROUP PLC; DEUTSCHE
   BANK AG; CITIGROUP, INC.;
28

                              - 1 -                    COMPLAINT _____

934518.6

1   CITIBANK, N.A.; DEUTSCHE BANK
    SECURITIES; BANC OF AMERICA
2   SECURITIES, LLC; CREDIT SUISSE
    SECURITIES (USA) LLC.; UBS
3   FINANCIAL SERVICES INC.; J.P.
    MORGAN SECURITIES INC.;
4   CITIGROUP GLOBAL MARKETS INC.;
    CITIGROUP FUNDING, INC.; RBS
5   SECURITIES INC. (F/K/A GREENWICH
    CAPITAL MARKETS, INC.); BANK OF
6   SCOTLAND PLC; CREDIT SUISSE
    HOLDINGS (USA) INC;
7   CHASE BANK USA;
    JPMORGAN CHASE BANK NA;
8   JP MORGAN SECURITIES LLC;
    HSBC BANK USA;
9   HSBC FINANCE CORPORATION;
    HSBC SECURITIES (USA) INC;
10  BARCLAYS US FUNDING CORP;
    LLOYDS TSB BANK PLC;
11  UBS FINANCE (DELAWARE) INC;
    UBS FINANCIAL SERVICES INC;
12  UBS SECURITIES LLC;
    DEUTSCHE BANK FINANCIAL LLC;
13  CITIZENS BANK, NA; CITIZENS BANK
    OF MASSACHUSETTS; CITIZENS
14  BANK OF PENNSYLVANIA; and RBS
    CITIZENS, NA,
15
16              Defendants.
17

18          Plaintiffs Charles Schwab Bank, N.A., Charles Schwab & Co., Inc., and The

19  Charles Schwab Corporation ("Plaintiffs"), by their counsel, allege as follows:

20                          **NATURE OF THE ACTION**

21          1.      This case arises from ongoing manipulation of the London Interbank Offered Rate

22  ("LIBOR") by a cadre of prominent financial institutions. Beginning in 2007 and continuing

23  approximately until the announcement of government investigations and subpoenas in March

24  2011 (the "Relevant Period"), Defendants (identified below) purported to report to the British

25  Bankers' Association ("BBA") the actual interest rates they paid on funds they borrowed from

26  other financial institutions—i.e., their true "costs of borrowing"—on a daily basis. The BBA then

27  relied on the false information Defendants provided to set LIBOR, a benchmark set of interest

28

934518.6

rates used to price trillions of dollars' worth of financial instruments worldwide.  By acting together and in concert to knowingly understate to the BBA their true costs of borrowing, Defendants caused LIBOR to be set artificially low.

2.    Defendants perpetrated their fraudulent scheme and conspiracy to artificially depress LIBOR as a means to pay lower interest rates on interest-bearing financial instruments and securities paying returns based on, tied to, benchmarked or indexed to LIBOR (collectively, "LIBOR-based instruments and securities") that Defendants sold to investors, including Plaintiffs. Specifically, Defendants misrepresented, in connection with numerous offerings of LIBOR-based instruments and securities during the Relevant Period, that the interest rates investors would receive on the subject LIBOR-based instruments and securities were based on LIBOR, when in fact Defendants were actively working together to ensure LIBOR was set at artificially low rates. Thus surreptitiously bilking investors of their rightful rates of return on their investments, Defendants reaped hundreds of millions, if not billions, of dollars in ill-gotten gains. Defendants—in the debt securities context, the borrowers—have been cheating investors—the lenders—out of interest payments for years.  Moreover, by understating their true costs of borrowing, Defendants provided a false or misleading impression of their financial strength to investors.

3.    Defendants' manipulation similarly depressed returns on securities they sold and issued that paid a fixed rate of return, such as fixed-rate notes.  As Defendants know, market participants use LIBOR as the starting point for negotiating rates of return on short-term fixed-rate instruments, such as fixed-rate notes maturing in a year or less.  Defendants borrowed money from Plaintiffs by issuing short-term paper at a rate set as a spread above LIBOR.  By depressing LIBOR, Defendants paid lower interest rates on short-term paper Plaintiffs purchased from them. Additionally, by depressing LIBOR, Defendants depressed the rates of return Plaintiffs earned on short-term paper they purchased from other entities who based those rates on LIBOR.

4.    While Defendants successfully perpetrated their unlawful scheme for years (amid isolated expressions of concern by some market participants), a series of recently initiated government investigations within the United States and abroad has begun to shed light on

- 3 -

COMPLAINT _____

Defendants' malfeasance. Among other things, UBS recently disclosed that it received a grant of conditional leniency from the United States Department of Justice ("DOJ") under the Antitrust Criminal Penalties Enhancement and Reform Act and the DOJ's Corporate Leniency Policy in exchange for cooperating with the DOJ's investigation into LIBOR manipulation. Under that policy, the DOJ only grants leniency to corporations that report *actual illegal activity*. Other Defendants likewise are targets of government investigations concerning the misconduct alleged in this Complaint.

5.     During the Relevant Period, Plaintiffs acquired tens of billions of dollars' worth of LIBOR-based instruments and securities from Defendants and other issuers, which paid artificially low returns to Plaintiffs based on Defendants' manipulation of LIBOR.

6.     Plaintiffs now seek relief for the damages they have suffered as a result of Defendants' violations of federal and state law. Plaintiffs assert claims under the Sherman Act, 15 U.S.C. §§ 1 *et seq.*; the Clayton Act, 15 U.S.C. §§ 12 *et seq.*; the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k; the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5; the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*; and the statutory and common law of California. Plaintiffs' allegations are based on personal knowledge with respect to their own conduct and on information and belief as to other allegations based on facts obtained during the course of their attorneys' investigation.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26(a); Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Section 22 of the Securities Act, 15 U.S.C. § 77v; and 28 U.S.C. §§ 1331 and 1337. The Court may exercise supplemental jurisdiction, in accordance with 28 U.S.C. § 1367, over Plaintiffs' state-law claims.

8.     This Court has personal jurisdiction over all of the Defendants by virtue of their business activities in this jurisdiction.

934518.6

COMPLAINT _____

9. Venue is proper in the Northern District of California under Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 1965 of RICO, 18 U.S.C. § 1965; and 28 U.S.C. § 1391(b), (c) and (d). Each Defendant transacted business in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants' unlawful conduct manipulated the prices of LIBOR-based instruments and securities traded in this District.

## THE PARTIES

### PLAINTIFFS

10. Plaintiff The Charles Schwab Corporation is a corporation organized under the laws of Delaware, with its principal place of business in San Francisco, California.

11. Plaintiff Charles Schwab Bank, N.A. is a national banking association organized under the laws of Arizona and headquartered in Reno, Nevada. Charles Schwab Bank, N.A., is a wholly-owned subsidiary of The Charles Schwab Corporation.

12. Plaintiff Charles Schwab & Co., Inc. is a California Corporation and a wholly-owned subsidiary of The Charles Schwab Corporation. Charles Schwab & Co., Inc., through its division Charles Schwab Treasury manages the investments of Charles Schwab Bank, N.A. Charles Schwab Treasury is the entity to which Defendants directed their solicitations to purchase all LIBOR-based instruments and securities referred to in this Complaint. Charles Schwab Treasury received those solicitations and executed the purchase of all LIBOR-based instruments and securities referred to in this Complaint.

### DEFENDANTS

### A.    LIBOR Panel Members

13. Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.

14. Defendant Bank of America, N.A., is a national banking association incorporated in North Carolina and with its principal place of business in Charlotte, North Carolina. It is a wholly-owned subsidiary of NB Holdings Corporation, which in turn is wholly-owned by Defendant Bank of America Corporation. Defendants Bank of America, N.A. and Bank of

- 5 -

America Corporation are collectively referred to as "Bank of America."

15.     Defendant Credit Suisse Group AG is a Swiss company headquartered in Zurich, Switzerland.

16.     Defendant J.P. Morgan Chase & Co. is a Delaware financial holding company headquartered in New York, New York.

17.     Defendant HSBC Holdings plc is a British public limited company headquartered in London, England.

18.     Defendant Barclays Bank plc is a British public limited company headquartered in London, England.

19.     Defendant Lloyds Banking Group plc is a British public limited company headquartered in London, England.  Lloyds was formed in 2009 through the acquisition of HBOS plc by Lloyds TSB Bank plc.

20.     Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany.

21.     Defendant UBS AG is a Swiss company based in Basel and Zurich, Switzerland.

22.     Defendant Royal Bank of Scotland Group plc is a British public limited company headquartered in Edinburgh, Scotland.

23.     Defendant Deutsche Bank, AG is a German financial services company headquartered in Frankfurt, Germany.

24.     Defendant Citibank, N.A. is a wholly-owned subsidiary of Defendant Citigroup, Inc., a United States financial services corporation headquartered in New York, New York. Defendants Citibank, N.A., and Citigroup, Inc., are collectively referred to as "Citibank."

25.     During the Relevant Period, each of the Defendants listed in paragraphs 13-24 was a member of the BBA's U.S. Dollar LIBOR panel.  These Defendants are referred to collectively as the "LIBOR Panel Defendants."

COMPLAINT _____

934518.6

1          **B.      Affiliated Securities Dealers**

2          26.      Defendant Deutsche Bank Securities is a broker-dealer organized under Delaware

3    law and doing business in New York, New York.  It is a wholly-owned subsidiary of Defendant

4    Deutsche Bank AG.

5          27.      Defendant Banc of America Securities, LLC is a corporation organized under

6    Delaware law and a wholly-owned subsidiary of Defendant Bank of America Corporation.

7          28.      Defendant Barclays Capital Inc. is a corporation organized under Connecticut law

8    and doing business in New York, New York.  It is a division of Defendant Barclays plc.

9          29.      Defendant Credit Suisse Securities (USA) LLC is a corporation organized under

10   Delaware law and doing business in New York, New York.

11         30.      Defendant UBS Financial Services Inc. is a corporation organized under Delaware

12   law doing business in Weehawken, New Jersey.

13         31.      Defendant J.P. Morgan Securities Inc., f/k/a Bear Stearns & Co., is a corporation

14   organized under Delaware law and a wholly-owned subsidiary of Defendant JP Morgan Chase

15   Bank, N.A.

16         32.      Defendant Citigroup Global Markets Inc. is a broker-dealer New York corporation

17   organized under New York law.  It is a subsidiary of Defendant Citigroup, Inc.

18         33.      Defendant Citigroup Funding, Inc. is a corporation organized under Delaware law.

19   It is a subsidiary of Defendant Citigroup, Inc.

20         34.      Defendant RBS Securities, Inc., (f/k/a Greenwich Capital Markets, Inc.) is a

21   corporation organized under Delaware law doing business in Connecticut.  It is a subsidiary of

22   Defendant Royal Bank of Scotland Group plc.

23         35.      Defendant Bank of Scotland plc is a bank organized under U.K. law, based in

24   Edinburgh.  It is a subsidiary of Defendant Lloyds Banking Group plc.

25         36.      Defendant Credit Suisse Holdings (USA) Inc is a corporation organized under

26   Delaware law and doing business in New York, New York.  It is a subsidiary of Defendant Credit

27   Suisse Group AG.

28         37.      Defendant Chase Bank USA, N.A. is a national banking association incorporated

COMPLAINT _____

934518.6

1    in Delaware, with its principal place of business in Newark, Delaware, and is a wholly-owned

2    subsidiary of Defendant JPMorgan Chase & Co.

3        38.     Defendant JPMorgan Chase Bank NA s a corporation organized under Delaware

4    law and a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.

5        39.     Defendant JP Morgan Securities LLC is a corporation organized under Delaware

6    law and a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.

7        40.     Defendant HSBC Bank USA, N.A. is the principal subsidiary of HSBC USA Inc.,

8    an indirect, wholly-owned subsidiary of HSBC North America Holdings Inc.

9        41.     Defendant HSBC Finance Corporation is a subsidiary of HSBC North America

10   Holdings Inc., owned by HSBC Holdings plc, the parent company of the HSBC Group.  HSBC

11   Finance Corporation is headquartered in London, England.

12       42.     Defendant HSBC Securities (USA) Inc is a corporation organized under the laws

13   of Delaware, with its principal place of business in New York, New York, and is a subsidiary of

14   HSBC North America Holdings, Inc.

15       43.     Barclays US Funding LLC, formerly known as Barclays U.S. Funding

16   Corporation, is a corporation organized under Delaware law and doing business in New York,

17   New York.

18       44.     Defendant Lloyds TSB Bank PLC  is a British public limited company

19   headquartered in London, England.  It is a subsidiary of Defendant Lloyds Banking Group plc.

20       45.     Defendant UBS Finance (Delaware) Inc. is a corporation organized under

21   Delaware law doing business in New York, New York.  It is a wholly-owned subsidiary of

22   Defendant UBS AG.

23       46.     Defendant UBS Securities LLC (f/k/a USB Warburg LLC) is a corporation

24   organized under Delaware law doing business in Connecticut.  It is a wholly-owned subsidiary of

25   Defendant UBS AG.

26       47.     Defendant Deutsche Bank Financial LLC is a limited liability company organized

27   under Delaware law.  It is a subsidiary of Defendant Deutsche Bank, AG.

28       48.     Defendant Citizens Bank, NA is a national banking association organized under

934518.6                                                    COMPLAINT _____

1    Rhode Island Law doing business in Rhode Island.  It is a subsidiary of Citizens Financial Group,

2    Inc., a wholly-owned subsidiary of Defendant Royal Bank of Scotland Group plc.

3        49.    Defendant Citizens Bank of Massachusetts was merged into and subsequently

4    operated as part of RBS Citizens, National Association in Providence, Rhode Island.

5        50.    Defendant Citizens Bank of Pennsylvania is a national banking association

6    organized under the laws of Pennsylvania and headquartered in Philadelphia, Pennsylvania.  It is

7    a subsidiary of Citizens Financial Group, Inc. a wholly-owned subsidiary of Defendant Royal

8    Bank of Scotland Group plc.

9        51.    Defendant RBS Citizens, NA, formerly known as Citizens Bank of Massachusetts,

10   is a national banking association organized under the laws of Maryland and headquartered in

11   Providence, Rhode Island.

12       52.    The entities identified in paragraphs 27-52 are referred to collectively as the

13   "Securities Dealer Defendants."

14       53.    Each of the Securities Dealer Defendants joined and furthered the conspiracy by

15   selling LIBOR-based instruments and securities at elevated prices and that paid depressed rates of

16   interest as a result of the misconduct alleged herein, to the direct benefit of their corporate parents

17   that manipulated LIBOR.

18       54.    The LIBOR Panel Defendants agreed to manipulate LIBOR on behalf of, and

19   reported this manipulation to, their respective corporate families.  As a result, the entire corporate

20   family was represented in these meetings and discussions by their agents and were parties to the

21   agreements reached in them.  Furthermore, to the extent that subsidiaries or affiliates within the

22   corporate families sold LIBOR-based instruments and securities to buyers such as Plaintiffs, these

23   subsidiaries and affiliates played a significant role in the conspiracy.  Thus, all entities within the

24   corporate families that were engaged in the setting of LIBOR or the marketing, sale and

25   distribution of such LIBOR-based instruments and securities were active, knowing participants in

26   the alleged conspiracy.

27

28

1

## FACTUAL ALLEGATIONS

2   **A.**   **LIBOR Was The Touchstone Of The Represented Rates Of Return On The LIBOR-
3   Based Instruments And Securities Plaintiffs And Other Investors Purchased During
The Relevant Period.**

4           55.     LIBOR is a set of reference or benchmark interest rates priced to different ranges

5   of maturity, from overnight to one year.  Thomson/Reuters calculates LIBOR each business day

6   on behalf of the BBA, which first began setting LIBOR on January 1, 1986.  The BBA establishes

7   LIBOR based on the rates 16 major international banks, including the LIBOR Panel Defendants,

8   reported as their costs of borrowing.  The banks inform the BBA of their costs of borrowing funds

9   at different maturity dates (e.g., one month, three months, six months).  The BBA discards the

10  upper four and lower four quotes and sets LIBOR by calculating the mean value of the remaining

11  middle eight quotes, known as an "inter-quartile" methodology.  The BBA then publishes

12  LIBOR, also reporting the quotes on which it based the LIBOR calculation.

13          56.     LIBOR serves a crucial role in the operation of financial markets.  For example,

14  market participants commonly set the interest rate on floating-rate notes as a spread against

15  LIBOR (e.g., "LIBOR + [X] bps").  Market participants also use LIBOR as a basis to determine

16  the correct rate of return on short-term fixed-rate notes.  Additionally, the pricing and settlement

17  of Eurodollar futures and options, the most actively traded interest rate futures contracts on the

18  Chicago Mercantile Exchange, are based on the three-month LIBOR.  LIBOR thus affects the

19  pricing of trillions of dollars' worth of financial transactions.  As alleged below, Plaintiffs

20  purchased tens of billions of dollars worth of LIBOR-based instruments and securities from

21  Defendants and other issuers during the Relevant Period.

22          **B.**    **Defendants Manipulated LIBOR During The Relevant Period.**

23          57.     Throughout the Relevant Period Defendants and other members of the U.S. dollar

24  LIBOR panel conspired to suppress LIBOR below levels at which it would have been set had

25  they accurately reported their costs of borrowing.  As explained below, Defendants' scheme is

26  evidenced in the aberrant behavior of LIBOR and the rates the LIBOR Panel Defendants reported,

27  which tended to "bunch" near the bottom quartile of the collection of reported rates used to set

28  LIBOR and did not properly correlate with other simultaneous economic measures of

934518.6

- 10 -

COMPLAINT _____

1    Defendants' costs of borrowing, such as credit default swap ("CDS") insurance premiums and the

2    Eurodollar Bid Rate.

3         **1.    Defendants Commenced Their Scheme In 2007 And Perpetuated It
              Amid Isolated Expressions of Concern By Some Market Participants.**

4

5         58.    In November 2007, a concern arose among some in the U.K. banking community

6    that the members of the U.S. dollar LIBOR panel, including the LIBOR Panel Defendants, might

7    be understating their true costs of borrowing, thus causing LIBOR to be set artificially low.  Some

8    U.K. banks raised their concerns at a meeting of the Bank of England that month.

9         59.    In response to those concerns, specifically "anecdotal evidence gathered from

10   conversation with market participants … that the rates quoted and paid by banks on their

11   interbank borrowing tended to vary more than usual (and by more than what appears in the

12   LIBOR panel) during the turbulence," the Bank for International Settlements ("BIS") in Spring

13   2008 produced a study of the U.S. dollar LIBOR ("USD-LIBOR").  Overnight-indexed swaps

14   ("OIS") are viewed as virtually risk-free, so the positive difference between LIBOR and interest

15   rates on those swaps should reflect the credit risk of the quoting banks.  Specifically, the BIS

16   examined two values:  (i) the difference, or "spread," between USD-LIBOR and OIS; and  (ii) the

17   BIS compared the LIBOR-OIS spread to the cost of CDS insurance on the debt of the BBA panel

18   banks.  Absent manipulation, those two values should exhibit a stable relationship, because they

19   both depend on the same thing:  the credit risk of the quoting banks.

20        60.    Contrary to that expectation, the BIS found an unusually "loose" relationship

21   between CDS premiums and the LIBOR-OIS spread, beginning in August 2007 and continuing at

22   least into 2008, when the BIS published its findings.  During that time, CDS premiums led the

23   LIBOR-OIS spread in an upward trend.  In other words, the cost of CDS insurance on the debt of

24   the panel banks increased more swiftly than the difference between LIBOR and interest rates on

25   OIS, when the two values should have behaved similarly.

26        61.    On May 29, 2008, The Wall Street Journal published the results of a study it had

27   commissioned comparing the quotes of LIBOR panel banks with the contemporaneous cost of

28

COMPLAINT _____

934518.6

1 buying default insurance (i.e., a CDS) on the banks' debt.[1] The Journal found that beginning in

2 January 2008, "the two measures began to diverge, with reported LIBOR rates failing to reflect

3 rising default-insurance costs." The Journal further found that the widest gaps existed with

4 respect to the LIBOR quotes of Citibank, WestLB, HBOS, JP Morgan and UBS.

5       62.     The Journal also compared the banks' LIBOR quotes to their actual costs of

6 borrowing in the commercial paper market. The Journal reported, for example, that in mid-April

7 2008, UBS paid 2.85% to borrow dollars for three months; but on April 16, 2008, UBS reported a

8 borrowing cost of 2.73% to the BBA as its LIBOR reference quote.

9       63.     The Journal further reported an uncanny equivalence between the banks' LIBOR

10 quotes: the three-month borrowing rates the banks reported remained within a range of only 0.06

11 of a percentage point, even though at the time their CDS insurance costs (premiums) varied much

12 more widely, reflecting the market's differing views as to the banks' creditworthiness. The

13 Journal quoted Stanford University professor Darrell Duffie, who described the unity of the

14 banks' LIBOR quotes as "far too similar to be believed." Calculating an alternate borrowing rate

15 incorporating CDS spreads the Journal estimated that underreporting of LIBOR had a $45 billion

16 effect on the market, representing the amount borrowers (the banks) did not pay to lenders

17 (investors in debt securities issued by the banks) that they would otherwise have had to pay.

18       64.     In May 2008, following the Journal's reports, Tim Bond, the head of asset-

19 allocation research at Barclays, admitted "the rates the banks were posting to the BBA became a

20 little divorced from reality" during 2007-2008, adding:

21          We had one week in September where our treasurer, who takes his
            responsibilities pretty seriously, said, "Right, I've had enough of
22          this, I'm going to quote the right rates". All we got for our pains
            was a series of media articles saying that we were having difficulty
23          financing.[2]

24       65.     In a report published mid-April 2008 entitled "Is LIBOR Broken?", Citibank's

25 Scott Peng, an interest rate analyst, wrote "Libor at times no longer represents the level at which

26 _____

27 [1] Mollenkamp & Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks
   May Have Reported Flawed Interest Data for LIBOR," The Wall Street Journal, May 29, 2008.
   [2] http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/2790833/Libor-credibility-
28 questioned-by-Barclays-strategist.html.

COMPLAINT _____

934518.6

1  banks extend loans to others."  He concluded that LIBOR was suppressed by 30 basis points

2  ("bps").[3]  Peng resigned approximately one year later.  Reports of his resignation referenced his

3  disclosures about LIBOR.  On April 18, 2008, Credit Suisse's William Porter, a credit strategist,

4  estimated an even greater suppression:  40 bps (as reported that day by the Journal).

5        66.    On April 3, 2008, the Bank of England money-market committee held a meeting

6  of U.K. banks.  The minutes of that meeting state: "U.S. Dollar Libor rates had at times appeared

7  lower than actual traded interbank rates."

8        67.    Right after the Journal's original April 16, 2008 article, the LIBOR panel banks

9  raised their quotes, causing LIBOR to log its biggest increase since August 2007, falsely and

10  misleadingly signaling that any improper reporting of false rates that may have previously

11  occurred had ended.

12      2.    **The Discrepancy Between Defendants' Reported LIBOR Quotes And Their CDS Spreads Evinces Defendants' Improper Scheme.**

13        68.    Despite the reporting in 2008 described above, the LIBOR Panel Defendants

14  continued to give LIBOR quotes that in fact deviated from their costs of borrowing as reflected in

15  CDS spreads.  Citibank, for example, reported rates virtually identical to those of the Bank of

16  Tokyo-Mitsubishi, another U.S. dollar LIBOR panel member, even though the banks had vastly

17  different costs of borrowing, as implied by the respective costs of CDS insurance on their debt.

---

[3] 100 basis points equal 1%.

COMPLAINT

934518.6





| | |
|---|---|
| —— Citigroup's Quote | — — Bank of Tokyo's Quote |
| —— Citigroup's CDS spread | – – – Bank of Tokyo's CDS spread |

69.　　Indeed, during much of 2009, Citibank's panel quote was, anomalously, *lower* than the premiums on its CDS, which if true would mean anyone lending to Citibank at interbank rates would, after purchasing CDS insurance, incur a 5% *loss*. That discrepancy contravenes basic rules of economics and finance, thus indicating that Citibank underreported its borrowing costs to the BBA.

### 3.　Deviations Among Banks Participating In The Same Currencies Indicates That Defendants Manipulated LIBOR.

70.　　The LIBOR Panel Defendants' reported rates also displayed inexplicable ranking anomalies. Specifically, the LIBOR Panel Defendants reported lower rates on USD-LIBOR than did their colleagues on the panel, yet, for other currencies, provided higher rates than did those same other banks. Both Bank of America and Bank of Tokyo, for instance, quoted rates for the USD-LIBOR and Yen-LIBOR during the period under study, yet Bank of America quoted a lower rate than Bank of Tokyo on USD LIBOR and a *higher* rate than Bank of Tokyo on Yen-LIBOR. Other banks suspected of rate manipulation displayed similar anomalies across currencies, as the graphs below demonstrate. Citibank, for example, often reported rates at the top of the Yen-LIBOR scale while simultaneously quoting rates at the bottom of the USD-LIBOR

- 14 -

COMPLAINT _____

scale.  Those discrepancies make no economic sense:  an enormous financial institution like Citibank is not substantially more or less creditworthy for purposes of borrowing yen versus dollars.



4.    **Quote-Bunching**

71.    The LIBOR Panel Defendants' LIBOR quotes also demonstrate anomalous "bunching" around the fourth-lowest rate submitted by the 16 reference banks to the BBA every day.  As the graphs below demonstrate, during the Relevant Period the rates reported by the LIBOR Panel Defendants tended to "bunch" around the fourth-lowest quote much more commonly than the CDS spreads of the banks tended to "bunch" around the fourth-lowest spread. That discrepancy defies common economic reasoning, which indicates that the distribution of rates and CDS spreads should be the same or very similar.  The rates reported by Citibank and Bank of America, in particular, often tended to be identical to the fourth-lowest quote.

COMPLAINT _____



72.     Given the method by which the BBA calculates LIBOR—discarding the highest and lowest reported rates and averaging the remainder—that high concentration around the fourth-lowest rate is exactly what would occur if a number of banks sought in concert to depress LIBOR.

### 5.     The Anomalous Eurodollar Bid Rate-LIBOR Spread Beginning After August 2007 Also Reflects Defendants' Scheme.

73.     Defendants' conduct also caused LIBOR to break its historic—and economically dictated—relationship with the Eurodollar Bid Rate. "Eurodollars" are time-deposits for dollars located outside the United States. The "Eurodollar Bid Rate" is the rate of interest offered on such deposits. In other words, it is the rate offered to attract dollars, whereas LIBOR is, essentially, the rate asked of a party seeking dollars. Thus, before August 2007, the previous day's Eurodollar Bid Rate was closely aligned with, and was a good predictor of, LIBOR. The Eurodollar Bid Rate had usually tracked 6-12 bps below LIBOR, suggesting something like a bid-ask spread. Thus, if, hypothetically, the Eurodollar Bid Rate were 2.5%, one would expect LIBOR that same day to fall between 2.56% and 2.62%.

COMPLAINT

934518.6

74.     After August 2007, however, that relationship broke down: the spread inverted, with LIBOR skewing lower than the Eurodollar Bid Rate by substantial amounts through 2009. The Eurodollar Bid Rate no longer predicted LIBOR; the prior-day's LIBOR became a much better predictor. An analysis of the Eurodollar Bid Rate over time implies that LIBOR continued to be understated by as much as 30-40 basis points through 2009.

75.     The following shows the breakdown of the relationship between the Eurodollar Bid Rate and LIBOR from 2007 to 2009.



**C.    Defendants Possessed Strong Incentives to Manipulate LIBOR.**

76.     Defendants each had a substantial financial incentive to manipulate LIBOR because each had billions of dollars in exposures to movements in interest rates. Citibank, Bank of America and JPMorgan, for instance, reported billions of dollars (notional) in interest rate swaps during the period under study; even a small unhedged exposure to interest rates would have had a substantial effect on revenues. Indeed, all three banks reported increased net interest revenues in the first quarter of 2009, when LIBOR fell dramatically. Similarly, in 2009 Citibank reported it would make $936 million in net interest revenue if rates would fall by 25 bps per quarter over the next year and $1.935 billion if they fell 1% instantaneously. JP Morgan also

- 17 -

COMPLAINT _____

1 reported significant exposure to interest rates in 2009: it predicted that if interest rates increased

2 by 1%, it would lose over $500 million. HSBC and Lloyds also predicted they would earn

3 hundreds of millions of additional dollars in 2008-2009 in response to lower interest rates, and

4 lose comparable amounts in response to higher rates. These banks collectively earned billions in

5 net interest revenues during the Relevant Period. Underreporting the banks' costs of borrowing

6 also had the benefit of disguising the true risks to their solvency and liquidity during a time of

7 economic crisis and intense political pressure.

8 **D.** **Defendants' Misconduct Has Incited Numerous Pending Government Investigations.**

9        77.    Numerous regulators, professional organizations, analysts and news agencies

10 recently have begun investigating the LIBOR Panel Defendants' reported LIBOR rates.

11        78.    On March 15, 2011, UBS disclosed that it had received subpoenas from the SEC,

12 the Commodity Futures Trading Commission ("CFTC") and the DOJ seeking information

13 concerning "whether there were improper attempts by UBS, either acting on its own or together

14 with others, to manipulate LIBOR at certain times." UBS reported that the Japanese Financial

15 Supervisory Agency also requested information relating to UBS's LIBOR self-reporting.

16        79.    On March 15, 2011, the *Financial Times* reported that the U.K.'s Financial

17 Services Authority ("FSA") had requested similar information from UBS.

18        80.    The *Financial Times* also reported that Bank of America, Citibank and Barclays

19 had received subpoenas from the FSA and that "[a]ll the [BBA] panel members are believed to

20 have received at least an informal request for information[.]"

21        81.    Lloyds Banking Group, Barclays, and RBS have also disclosed that they are

22 subjects of the FSA's investigation.

23        82.    On July 26, 2011, news sources reported that UBS had disclosed that it had

24 received a grant of conditional leniency from the DOJ in exchange for cooperating with the

25 DOJ's investigation into LIBOR manipulation. UBS has received conditional leniency pursuant

26 to the Antitrust Criminal Penalties Enhancement and Reform Act and the DOJ's Corporate

27 Leniency Policy. Under that policy, the DOJ only grants leniency to corporations that report

28 actual illegal activity.

E.    **Plaintiffs Have Suffered Significant Harm As A Result of Defendants'**
      **Misconduct.**

83.    Throughout the Relevant Period, Defendants' manipulation of LIBOR caused damage to Plaintiffs. All told, Defendants' conduct affected the value of tens of billions of dollars in LIBOR-based instruments and securities Plaintiffs held or purchased. Most of those securities and instruments fell into one of the following categories.

84.    Floating-rate notes and other LIBOR-based instruments and securities sold or issued to Plaintiffs by Defendants. Throughout the Relevant Period, Plaintiffs bought floating-rate notes from and issued by Defendants. These notes paid a rate of return based on LIBOR. Defendants' suppression of LIBOR caused Plaintiffs to receive lower returns on these notes than they would have if LIBOR had been properly set. Plaintiffs relied on the accuracy of LIBOR in undertaking these transactions.

85.    Floating-rate notes and other LIBOR-based instruments and securities sold or issued to Plaintiffs by entities other than Defendants. Throughout the Relevant Period, Plaintiffs bought floating-rate notes from and issued by entities other than Defendants, e.g. short-term commercial paper. As is well-known to sophisticated market participants like Defendants, these notes are affected by, and pay returns based on, LIBOR. Defendants' suppression of LIBOR caused Plaintiffs to receive lower returns on these notes than they would have if LIBOR had been properly set. Plaintiffs relied on the accuracy of LIBOR in undertaking these transactions.

86.    Fixed-rate notes and other LIBOR-based instruments and securities sold or issued to Plaintiffs by Defendants. Throughout the Relevant Period, Plaintiffs bought fixed-rate notes from and issued by Defendants. These notes paid a fixed rate of return. However, the price of these notes and the fixed rate or return were determined based on LIBOR. Defendants' suppression of LIBOR caused Plaintiffs to receive lower returns on these notes and/or pay more for them than they would have if LIBOR had been properly set. Plaintiffs relied on the accuracy of LIBOR in undertaking these transactions.

87.    Fixed-rate notes and other LIBOR-based instruments and securities sold or issued to Plaintiffs by entities other than Defendants. Throughout the Relevant Period, Plaintiffs bought

COMPLAINT _____

934518.6

1   fixed-rate notes from and issued by entities other than Defendants. As is well-known to

2   sophisticated market participants like Defendants, these notes are priced off of, and pay returns

3   based on, LIBOR. Defendants' suppression of LIBOR caused Plaintiffs to receive lower returns

4   on these notes than they would have if LIBOR had been properly set.

5   **FRAUDULENT CONCEALMENT**

6         88.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting

7   their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not

8   discover, and could not have discovered through the exercise of reasonable diligence, the

9   existence of the conspiracy alleged herein until 2011, when investigations by the DOJ and other

10   antitrust regulators became public. Defendants engaged in a secret conspiracy that did not give

11   rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to manipulate

12   LIBOR.

13   **CLAIMS FOR RELIEF**

14   **FIRST CLAIM FOR RELIEF**

15   **Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

16

17         89.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

fully set forth herein.

18

19         90.    Defendants entered into and engaged in a conspiracy in unreasonable restraint of

trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

20

21         91.    During the Relevant Period, Defendants controlled what LIBOR rate would be

22   reported and therefore controlled prices in the market for securities and contracts paying returns

based on LIBOR. Defendants competed in this market.

23

24         92.    The conspiracy consisted of a continuing agreement, understanding or concerted

25   action between and among Defendants and their co-conspirators in furtherance of which

26   Defendants fixed, maintained or made artificial prices for LIBOR-based instruments and

27   securities. Defendants' conspiracy constitutes a *per se* violation of the federal antitrust laws and

is, in any event, an unreasonable and unlawful restraint of trade.

28

- 20 -

COMPLAINT _____

93.    Defendants' conspiracy, and the resulting impact on the market for LIBOR-based instruments and securities, occurred in and affected interstate and international commerce.

94.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

95.    Plaintiffs are entitled to treble damages for the violations of the Sherman Act alleged herein.

**SECOND CLAIM FOR RELIEF**

**Interference with Economic Advantage (under California Law)**

96.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

97.    As set forth in this Complaint, Defendants manipulated LIBOR in violation of federal and state law.

98.    An economic relationship existed between Plaintiffs and issuers of LIBOR-based instruments and securities, which obligated the issuers to make payments to Plaintiffs at a rate dependent on LIBOR.

99.    Defendants' unlawful manipulation of LIBOR interfered with and disrupted that relationship by defeating the parties' expectations that LIBOR would be set honestly and accurately and would provide a fair benchmark for those securities.  As a result, Plaintiffs received lower payments on those securities than they otherwise would have, and overpaid for the securities, and were damaged thereby.

100.    Defendants acted with the knowledge that interference or disruption of Plaintiffs' relationships with issuers of securities indexed to LIBOR were certain or substantially certain to result from Defendants' unlawful manipulation of LIBOR.

**THIRD CLAIM FOR RELIEF**

**Violation of Section 17200 of the California Business and Professions Code (Unfair Business Practices)**

101.    Defendants have engaged in fraudulent, unfair and illegal conduct in violation of Section 17200 of the California Business and Professions Code ("Section 17200").  Defendants'

- 21 -

1  conduct was substantially injurious to Plaintiffs.

2       102.   Defendants' business acts and practices, as alleged herein, constituted—and still

3  constitute—a continuous course of unfair competition by means of unfair, unlawful or fraudulent

4  business acts or practices in violation of Section 17200, including the following:

5         a.  the violations of the antitrust, securities, wire fraud, mail fraud, bank fraud,

6            racketeering and other laws as set forth herein;

7         b.  Defendants' unfair business acts and practices, which induced investors, including

8            Plaintiffs, to purchase and retain the LIBOR-based instruments and securities

9            Defendants or others issued based on falsely-set LIBOR rates, and Defendants'

10            materially false and misleading statements about their costs of borrowing, made

11            with knowledge or reckless disregard that they were materially false or misleading

12            when made.

13       103.   Defendants' business acts and practices, as alleged herein, have caused Plaintiffs

14  to purchase and retain the subject LIBOR-based instruments and securities and, as a result, to

15  suffer losses.

16       104.   Plaintiffs are entitled to full relief, including full restitution or disgorgement of all

17  revenues, earnings, profits, compensation and benefits Defendants may have obtained as a result

18  of such business, acts or practices, and an injunction mandating that Defendants cease and desist

19  from engaging in the practices described herein.

20  **FOURTH CLAIM FOR RELIEF**

21  **Fraud, Deceit and Concealment (under Sections 1572, 1709 and 1710 of the California Civil
Code)**

22

23       105.   Plaintiffs incorporate by reference and reallege the preceding allegations as though
fully set forth herein.

24

25       106.   Plaintiffs purchased LIBOR-based instruments and securities issued by Defendants

26  and other entities. Those included floating-rate notes where Defendants paid interest rates based

27  on LIBOR, and fixed-rate notes where the parties determined the fixed rate of interest by

28  referencing LIBOR.

- 22 -

COMPLAINT _____

107. Defendants made numerous statements to Plaintiffs to induce them to purchase those notes and other financial instruments.

108. Contemporaneous with Plaintiffs' purchases, Defendants gave public quotes to the BBA of their supposed costs of borrowing.

109. In fact, Defendants' quotes to the BBA did not reflect their true costs of borrowing but instead reflected Defendants' scheme to unlawfully manipulate LIBOR.

110. Defendants never disclosed to Plaintiffs the inaccuracy of their quotes to the BBA or that Defendants had manipulated LIBOR to cause it to be lower than it should have been, and perpetrated an ongoing conspiracy to do so.

111. The inaccuracy of Defendants' reported quotes and their scheme to manipulate LIBOR were material facts of which Plaintiffs were unaware. If Defendants had disclosed those facts, Plaintiffs would not have purchased the subject securities, or at least would have demanded appropriately higher interest rates on those securities. Plaintiffs relied on the accuracy of Defendants' quotes, on the accuracy of LIBOR, and on the other statements by Defendants that did not include these material omissions.

112. Defendants' concealment of the inaccuracy of their reported quotes and their scheme to manipulate LIBOR damaged Plaintiffs because Plaintiffs received lower returns (via lower interest rates) than they would have had LIBOR been accurately and honestly set, or had Plaintiffs purchased securities not paying interest as a function of LIBOR.

## FIFTH CLAIM FOR RELIEF

### Violation of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k

113. Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

114. For purposes of this claim, Plaintiffs expressly disclaim and exclude any allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based expressly on claims of strict liability or negligence under the Securities Act.

115. Plaintiffs bring this claim in connection with all LIBOR-based notes or other

COMPLAINT _____

934518.6

1   securities Plaintiffs purchased in offerings during the Relevant Period.

2       116.    Each Defendant filed registration statements and other related documents in

3   connection with each of the subject offerings.

4       117.    Those registration statements and other related documents contained materially

5   false statements of fact, or omitted to state facts necessary to make the statements therein not

6   misleading.  Specifically, the documents omitted to state that Defendants, as set forth above, had

7   manipulated LIBOR in a downward direction by providing inaccurate quotes to the BBA and that

8   Defendants perpetuated an ongoing scheme to continue their manipulation.  Moreover,

9   representations in the subject registration statements and related documents that the interest rates

10  for the subject securities would be based on LIBOR were false or misleading as a result of

11  Defendants' manipulation of LIBOR.  Thus references to "LIBOR" in those documents constitute

12  affirmative misstatements.

13      118.    None of the Defendants made a reasonable investigation or possessed reasonable

14  grounds to believe that the statements contained in the registration statements were true or that

15  there was no omission of material facts necessary to make the statements made therein not

16  misleading.

17      119.    By reason of the conduct herein alleged, each Defendant violated Section 11 of the

18  Securities Act.

19      120.    As a direct and proximate result of Defendants' acts and omissions in violation of

20  the Securities Act, the prices or values of the notes and other securities sold in the subject

21  offerings were artificially inflated, and Plaintiffs suffered substantial damage in connection with

22  their ownership of those securities.

23      121.    As issuers of the subject securities, each Defendant is strictly liable to Plaintiffs for

24  the material omissions identified above.

25      122.    Plaintiffs obtained the subject securities without knowledge of the facts concerning

26  the misstatements or omissions alleged herein.

27      123.    This action is brought within one year after discovery of the untrue statements and

28  omissions should have been made through the exercise of reasonable diligence, and within three

COMPLAINT _____

934518.6

1   years of the effective date of the subject registration statements.

2       124.   Plaintiffs are entitled to damages under Section 11 from each Defendant, as

3   measured by the provisions of Section 11(e).

4

5                       **SIXTH CLAIM FOR RELIEF**

6       **Violation of Section 12(a)(2) of the Securities Act of 1933**

7       125.   Plaintiffs incorporate by reference and reallege the preceding allegations as though

8   fully set forth herein.

9       126.   For purposes of this claim, Plaintiffs expressly disclaim and exclude any

10  allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this

11  cause of action is based expressly on claims of strict liability or negligence under the Securities

12  Act.

13      127.   Defendants were sellers, offerors, underwriters or solicitors of sales of securities

14  issued by Defendants to Plaintiffs through prospectuses or oral communications during the

15  Relevant Period.

16      128.   The prospectuses or oral communications contained untrue statements of material

17  facts, omitted to state other facts necessary to make the statements made not misleading, and

18  concealed and failed to disclose material facts.  Defendants' actions of solicitation included

19  participating in the preparation of the false and misleading prospectuses or oral communications.

20      129.   Defendants owed to the purchasers of the subject securities, including Plaintiffs,

21  the duty to make a reasonable and diligent investigation of the statements contained in the

22  prospectuses or oral communications, to insure that such statements were true and that there was

23  not omission to state a material fact required to be stated in order to make the statements

24  contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care

25  should have known of, the misstatements and omissions contained in the prospectuses or oral

26  communications, as set forth above.

27      130.   Plaintiffs purchased or otherwise acquired securities pursuant to or traceable to the

28  defective prospectuses or oral communications.  Plaintiffs did not know, nor in the exercise of

- 25 -

COMPLAINT _____

934518.6

1    reasonable diligence could have known, of the untruths and omissions.

2        131.    Plaintiffs hereby offer to tender to Defendants those securities Plaintiffs continue

3    to own, in return for the considerations paid for those securities, together with interest thereon.

4        132.    By reason of the conduct alleged herein, Defendants violated, or controlled a

5    person who violated, Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs have the right

6    to rescind and recover the consideration paid for the subject securities and hereby elect to rescind

7    and tender those securities to Defendants.  Plaintiffs are entitled to rescissionary damages with

8    respect to those subject securities they have sold.

9        133.    Less than three years have elapsed from the time that the securities upon which

10   this count is brought were sold to the public to the time of the filing of this action.  Less than one

11   year has elapsed from the time when Plaintiffs discovered or reasonably could have discovered

12   the facts upon which this count is based to the time of the filing of this action.

13

14                          **SEVENTH CLAIM FOR RELIEF**

15          **Violation of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o**

16       134.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

17   fully set forth herein.

18       135.    This cause of action is being brought under Section 15 of the Securities Act, 15

19   U.S.C. §77o, against the LIBOR Panel Defendants.  This Count is based solely on strict liability

20   and negligence, and does not sound in fraud.  Any allegations of fraud or fraudulent conduct or

21   motive are specifically excluded.  For purposes of asserting this and its other claims under the

22   Securities Act, Plaintiffs do not allege that the LIBOR Panel Defendants acted with intentional,

23   reckless or otherwise fraudulent intent.

24       136.    Each of the LIBOR Panel Defendants, by virtue of its position as a parent

25   company or otherwise controlling entity of one or more of the Securities Dealer Defendants, was

26   a control person of one or more of the Securities Dealer Defendants.

27       137.    As a result, the LIBOR Panel Defendants are liable under Section 15 of the

28   Securities Act for the Securities Dealer Defendants' primary violations of Sections 11 or 12(a)(2)

                                   - 26 -                    COMPLAINT _____

of the Securities Act.

## EIGHTH CLAIM FOR RELIEF

### Violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Thereunder

138.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

139.    Beginning in 2007, Defendants carried out a plan, scheme and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase securities at artificially inflated prices. In furtherance of their unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

140.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit on the purchasers of the their securities in an effort to cause LIBOR to be set at an artificially low rate, which in turn allowed Defendants to pay lower interest rates on the notes and other securities Plaintiffs acquired from Defendants and other issuers, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

141.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the manipulation of LIBOR as specified herein.

142.    Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices and a course of conduct as alleged herein in an effort to secretly manipulate LIBOR, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make Defendants' statements during the Relevant Period— including their representations that the rates of the securities Defendants sold to Plaintiffs were based on LIBOR—in the light of the circumstances under which they were made, not misleading,

- 27 -

1   as set forth more particularly herein.  Moreover, Defendants engaged in transactions, practices

2   and a course of business that operated as a fraud and deceit upon the purchasers of the subject

3   securities during the Relevant Period, including Plaintiffs.

4          143.    Defendants had actual knowledge of the misrepresentations and omissions of

5   material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

6   ascertain and to disclose such facts, even though such facts were available to Defendants.

7   Defendants perpetrated such material misrepresentations or omissions knowingly or recklessly

8   and for the purpose and effect of concealing Defendants' manipulation of LIBOR from the

9   investing public, including Plaintiffs, and allowing Defendants to reap improper gains by failing

10  to pay to Plaintiffs the true (higher) rates on the subject securities.

11         144.    As a result of Defendants' dissemination of materially false and misleading

12  information and their failure to disclose material facts, as set forth above, Defendants caused

13  LIBOR to be artificially low during the Relevant Period.  The artificially depressed LIBOR rates

14  caused the interest rates on the subject securities (which were based on the artificially low LIBOR

15  rates) to be correspondingly, and artificially, low, which deprived Plaintiffs of returns they

16  otherwise would have realized on those securities.  In ignorance of those facts, and reasonably

17  relying directly or indirectly on Defendants' false and misleading statements, or on the integrity

18  of the market in which the securities traded, or on the absence of material adverse information

19  that Defendants knew or recklessly disregarded but was not disclosed by Defendants during the

20  Relevant Period, Plaintiffs acquired notes and other LIBOR-based securities during the Relevant

21  Period and received lower payments on those securities than they otherwise would have.

22         145.    At the time of said misrepresentations and omissions, Plaintiffs were unaware the

23  misrepresentations and omissions were false or misleading, and believed them to be true.  Had

24  Plaintiffs known the truth regarding Defendants' manipulation of LIBOR, which Defendants did

25  not disclose, Plaintiffs would not have purchased or otherwise acquired the subject securities, or

26  at least would have demanded appropriately higher interest rates on those securities.

27         146.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

28  suffered damages in connection with their purchases of the subject securities during the Relevant

COMPLAINT _____

934518.6

1  Period.

2      147.    This action was filed within two years of discovery of the facts constituting the

3  violation and within five years of the violation.

4

5              **NINTH CLAIM FOR RELIEF**

6      **Violation of Section 20(a) of the Securities Exchange Act of 1934**

7      148.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

8  fully set forth herein.

9      149.    The LIBOR Panel Defendants acted as controlling persons of the Securities Dealer

10  Defendants within the meaning of Section 20(a) of the Exchange Act as alleged herein. Each of

11  the LIBOR Panel Defendants, by virtue of its position as a parent company or otherwise

12  controlling entity of one or more of the Securities Dealer Defendants, was a control person of one

13  or more of the Securities Dealer Defendants, possessing the power and authority to cause one or

14  more of the Securities Dealer Defendants to engage in the wrongful conduct complained of

15  herein. The LIBOR Panel Defendants were provided with or had unlimited access to copies of

16  the statements alleged by Plaintiffs to be misleading prior to and/or shortly after those statements

17  were issued and had the ability to prevent the issuance of the statements or cause the statements to

18  be corrected.

19      150.    As set forth above, the Securities Dealer Defendants (as well as the LIBOR Panel

20  Defendants) each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in

21  this Complaint. By reason of such conduct, the LIBOR Panel Defendants are liable under Section

22  20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct,

23  Plaintiffs suffered damages in connection with their purchases of the subject securities during the

24  Relevant Period.

25              **TENTH CLAIM FOR RELIEF**

26      **Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.**
   **§§ 1961 _et seq._**

27

28      151.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

- 29 -

1    fully set forth herein.

2    **Defendants Engaged In Conduct Actionable Under RICO.**

3    152.    18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated

4   with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

5   to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

6   a pattern of racketeering activity or collection of unlawful debt."

7    153.    18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to

8   violate any of the provisions of subsection (a), (b), or (c) of this section."

9    154.    Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering

10   activity" means (among other things) acts indictable under certain sections of Title 18, including

11   18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C.

12   § 1344 (relating to financial institution fraud).

13    155.    18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering

14   activity," conduct "requires at least two acts of racketeering activity, one of which occurred after

15   the effective date of this chapter and the last of which occurred within ten years (excluding any

16   period of imprisonment) after the commission of a prior act of racketeering activity."

17    156.    18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of

18   holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as

19   "any individual, partnership, corporation, association, or other legal entity, and any union or

20   group of individuals associated in fact although not a legal entity."

21    157.    18 U.S.C. § 1341, the mail fraud statute invoked by 18 U.S.C. § 1961(1) as a

22   predicate act, makes it unlawful to have "devised or intend[ed] to devise any scheme or artifice to

23   defraud, or for obtaining money or property by means of false or fraudulent pretenses,

24   representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute,

25   supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation,

26   security, or other article, or anything represented to be or intimated or held out to be such

27   counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting

28   so to do, places in any post office or authorized depository for mail matter, any matter or thing

COMPLAINT _____

934518.6

1   whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any

2   matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or

3   takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail

4   or such carrier according to the direction thereon, or at the place at which it is directed to be

5   delivered by the person to whom it is addressed, any such matter or thing, shall be fined under

6   this title or imprisoned not more than 20 years, or both. If the violation affects a financial

7   institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30

8   years, or both."

9       158.    18 U.S.C. § 1343, the wire fraud statute invoked by 18 U.S.C. § 1961(1) as a

10  predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or

11  artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

12  representations, or promises, transmits or causes to be transmitted by means of wire, radio, or

13  television communication in interstate or foreign commerce, any writings, signs, signals, pictures,

14  or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or

15  imprisoned not more than 20 years, or both."

16      159.    18 U.S.C. § 1344, the federal bank fraud statute invoked by 18 U.S.C. § 1961(1) as

17  a predicate act, states:

18          Whoever knowingly executes, or attempts to execute, a scheme or
            artifice –
19
            1.      to defraud a financial institution, or
20
            2.      to obtain any of the moneys, funds, credits, assets,
21          securities, or other property owned by, or under the custody or
            control of, a financial institution, by means of false or fraudulent
22          pretenses, representations, or promises shall be fined not more than
            $1,000,000 or imprisoned for not more than 30 years, or both.
23

24      160.    At all relevant times, Defendants, including the employees who conducted

25  Defendants' affairs through illegal acts (including by communicating false interest rate quotes to

26  the BBA or directing other employees to do so) were "person[s]" within the meaning of 18 U.S.C.

27  § 1961(4), with a definable corporate structure and a hierarchy of corporate direction and control.

28      161.    At all relevant times, Plaintiffs were "person[s]" within the meaning of 18 U.S.C.

- 31 -

1 § 1961(3).

2 **Defendants Formed A RICO Enterprise.**

3    162.    Defendants' collective association, including through the LIBOR Panel

4 Defendants' participation together as members of the BBA's U.S. Dollar LIBOR panel,

5 constitutes the RICO enterprise in this case.  Every member of the enterprise participated in the

6 process of misrepresenting their costs of borrowing to the BBA.  Using those false quotes to

7 cause the BBA to set LIBOR artificially low, thereby allowing Defendants to increase their net

8 interest revenues by making artificially low payments to investors such as Plaintiffs, constitutes

9 the common purpose of the enterprise.

10    **The Enterprise Has Perpetrated A Continuing Practice Of Racketeering.**

11    163.    For at least four years before this Complaint was filed, Defendants, in concert,

12 made false statements to the BBA for the purpose and with the effect of manipulating LIBOR to

13 be lower than it otherwise would have been.  Defendants did so for the purpose and with the

14 effect of decreasing their payments to investors such as Plaintiffs and increasing their net interest

15 revenues.  Defendants earned hundreds of millions, if not billions, of dollars in wrongful profits

16 as a result, which they shared with the employees who perpetrated the scheme.  The conduct of

17 every party involved in the scheme is hardly an isolated occurrence that resulted in one fraudulent

18 charge.

19    164.    In perpetrating the fraudulent scheme, each Defendant directly or indirectly

20 through its corporate structure has designed and implemented a uniform scheme to manipulate

21 LIBOR.  Defendants' daily making and communicating of quotes to the BBA comprise one

22 common, uniform nearly identical system of procedures used in virtually an identical way every

23 day.

24    165.    For at least the past four years, Defendants have knowingly, intentionally or

25 recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by

26 committing the predicate acts of mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud

27 within the meaning of 18 U.S.C. § 1343, and bank fraud within the meaning of 18 U.S.C.

28 § 1344(2), by knowingly and intentionally implementing the scheme to make false statements

COMPLAINT _____

934518.6

1   about their costs of borrowing, to manipulate LIBOR, which allowed Defendants to reap unlawful

2   profits.

3           166.    Defendants have committed the predicate act of mail fraud under 18 U.S.C.

4   § 1341, thus triggering Section 1962(c) liability, by devising or intending to "devise a scheme or

5   artifice to defraud" purchasers and holders of notes and other securities, and "for the purpose of

6   executing such scheme or artifice or attempting so to do," placed or knowingly caused to be

7   placed in a post office or authorized depository for mail matter, documents or packages to be sent

8   or delivered by the Postal Service or a private or commercial interstate carrier, or received from

9   those entities such documents or packages, including: (i) documents offering for sale notes and

10  other securities and (ii) correspondence regarding offerings of notes and other securities (the

11  conduct described in this paragraph is referred to as the "Mail Fraud").

12          167.    On information and belief, the Mail Fraud is the result of Defendants "having

13  devised or intended to devise a scheme or artifice to defraud" holders of notes and other

14  securities, for the purpose of obtaining money from those holders of notes and other securities

15  through "false or fraudulent pretenses, representations, or promises."

16          168.    By devising the scheme or artifice to defraud consumers as described herein, and

17  for obtaining money from holders of notes and other securities through "false or fraudulent

18  pretenses, representations, or promises" about LIBOR-based notes and other securities,

19  Defendants transmitted or caused to be transmitted by means of "wire communication in

20  interstate or foreign commerce, . . . writings, signs, signals, [and] pictures," "for the purpose of

21  executing such scheme or artifice," including by: (i) transmitting documents offering notes and

22  other securities for sale; (ii) transmitting phony statements about their costs of borrowing; (iii)

23  transmitting e-mail communications relating to the process of determining, making or

24  transmitting phony statements about their borrowing costs; (iv) collecting funds from Plaintiffs

25  via electronic fund transfers or electronic communication with Plaintiffs' bank or credit card

26  institution; or (v) transmitting payments to Plaintiffs.

27          169.    In addition to that conduct, Plaintiffs are informed and believe Defendants used the

28  mails and wires in conjunction with reaching their agreement to make false statements about their

COMPLAINT _____

934518.6

1    costs of borrowing, to manipulate LIBOR.

2        170.    Plaintiffs do not base their RICO claims on any conduct that would have been

3    actionable as fraud in the purchase or sale of securities.

4    **The Racketeering Scheme Affected Interstate Commerce.**

5        171.    Through the racketeering scheme described above, Defendants used the enterprise

6    to improperly increase their profits to the detriment of holders of notes and other securities, who

7    resided in different states.

8        172.    Plaintiffs' allegations satisfy RICO's "interstate commerce" element because the

9    racketeering claims alleged herein arise out of, and are based on, Defendants' use of the Internet

10    or the mails across state lines as well as agreements between entities in different states to

11    manipulate LIBOR. Using those interstate channels to coordinate the scheme and transmit

12    fraudulent statements to Plaintiffs across state lines satisfies RICO's requirement of an effect on

13    interstate commerce.

14    **Defendants Conspired To Violate RICO.**

15        173.    Apart from constructing and carrying out the racketeering scheme detailed above,

16    Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C.

17    § 1962(d).

18        174.    The fraudulent scheme, as set forth above, alleges a violation of RICO in and of

19    itself.

20        175.    Defendants organized and implemented the scheme, and ensured it continued

21    uninterrupted by concealing their manipulation of LIBOR from investors, including Plaintiffs.

22        176.    Defendants knew the scheme would defraud purchasers and holders of notes and

23    other securities of millions of dollars of interest, yet each Defendant remained a participant

24    despite the fraudulent nature of the enterprise. At any point while the scheme has been in place,

25    any of the participants could have ended the scheme by abandoning the conspiracy and notifying

26    the public and law enforcement authorities of its existence. Rather than stopping the scheme,

27    however, the members of the enterprise deliberately chose to continue it, to the direct detriment of

28    investors such as Plaintiffs.

- 34 -

**Plaintiffs Suffered Injury Resulting From The Pattern of Racketeering Activity.**

177.   Because Plaintiffs unknowingly paid money to Defendants for notes and other securities that paid interest at a manipulated rate, and in fact collected less interest than they would have absent the conspiracy, Plaintiffs are direct victims of Defendants' wrongful and unlawful conduct.  Plaintiffs' injuries were direct, proximate, foreseeable and natural consequences of Defendants' conspiracy; indeed, those effects were precisely why the scheme was concocted.  In making payments to Defendants, Plaintiffs gave money in the custody or control of financial institutions.  There are no independent factors that account for Plaintiffs' economic injuries, and the loss of money satisfies RICO's injury requirement.

178.   The pattern of racketeering activity, as described in this Complaint, is continuous, ongoing and will continue unless Defendants are enjoined from continuing their racketeering practices.  Defendants have consistently demonstrated their unwillingness to discontinue the illegal practices described herein, and they continue their pattern of racketeering as of the filing of this Complaint.

179.   Plaintiffs are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

180.   As a direct and proximate result of the subject racketeering activities, Plaintiffs are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

**ELEVENTH CLAIM FOR RELIEF**

**Violation of Sections 25400 and 25401 of the California Corporations Code**

181.   Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

182.   Defendants, and each of them, acting individually and through a scheme and conspiracy, directly and indirectly, induced Plaintiffs' purchase and retention of the subject LIBOR-based instruments and securities by circulating or disseminating, in or from California, information for the purpose of inducing Plaintiffs to purchase and hold LIBOR-based instruments

- 35 -

COMPLAINT _____

1   and securities. Defendants omitted to inform Plaintiffs that they were engaged in an ongoing

2   scheme to suppress LIBOR that would cause any holder of the subject LIBOR-based instruments

3   and securities to receive lower payments than it otherwise would. Defendants knew their

4   statements were false or misleading in light of the circumstances under which they were made.

5   Defendants intended that Plaintiffs would be misled and would purchase LIBOR-based

6   instruments and securities based on false information. Despite their knowledge, Defendants

7   continued to make the misrepresentations to induce Plaintiffs to purchase LIBOR-based

8   instruments and securities.

9         183.   Defendants, and each of them, are liable under Sections 25500 and 25501 of the

10   California Corporations Code for willfully participating in acts or transactions in violation of

11   Sections 25400 and 25401 of the Corporations Code or for knowingly providing substantial

12   assistance to violations of Sections 25400 and 25401 in violation of Section 25403. Defendants

13   are therefore liable to Plaintiffs, who purchased LIBOR-based instruments and securities at a

14   price affected by Defendants' acts, for damages sustained as a result of such violations.

15         184.   Under Section 25504 of the California Corporations Code, Defendants, and each

16   of them, are also liable as control persons, officers, principals, employees, broker-dealers or

17   agents who provided material aid to a person in violation of Section 25503.

18         185.   Plaintiffs are entitled to prejudgment interest at the legal rate on their economic

19   damages.

20   **TWELFTH CLAIM FOR RELIEF**

21   **Breach of the Implied Covenant of Good Faith (under California Law)**

22         186.   Plaintiffs incorporate by reference and reallege the preceding allegations as though

23   fully set forth herein.

24         187.   Plaintiffs contracted to purchase from Defendants LIBOR-based instruments and

25   securities.

26         188.   Plaintiffs performed all of their obligations under the applicable contracts.

27         189.   All conditions required for Defendants' performance of those contracts were

28   satisfied.

- 36 -

934518.6

1    190.    Defendants unfairly interfered with Plaintiffs' right to receive the benefits of the

2    subject contracts by secretly manipulating LIBOR to be lower than it otherwise would have been,

3    as alleged in the foregoing paragraphs of this Complaint.

4    191.    Plaintiffs received less interest and lower returns on the LIBOR-based instruments

5    and securities than they would have absent Defendants' manipulation of LIBOR, and were

6    therefore harmed.

7    **THIRTEENTH CLAIM FOR RELIEF**

8    **Unjust Enrichment (under California Law)**

9    192.    By means of their unlawful conduct set forth in this Complaint—including

10   misrepresenting their costs of borrowing to the BBA to manipulate LIBOR—Defendants

11   knowingly acted in an unfair, unconscionable and oppressive manner toward Plaintiffs.

12   193.    Through their unlawful conduct, Defendants knowingly received and retained

13   wrongful benefits and funds from Plaintiffs.  Defendants thereby actd with conscious disregard

14   for Plaintiffs' rights.

15   194.    As a result of their unlawful conduct, Defendants have realized substantial ill-

16   gotten gains.  Defendants have unlawfully manipulated LIBOR at the expense of, and to the

17   detriment of, Plaintiffs, and to Defendants' benefit and enrichment.

18   195.    Plaintiffs' detriment and Defendants' enrichment are traceable to, and resulted

19   directly and proximately from, the conduct challenged in this Complaint.

20   196.    Under the common law doctrine of unjust enrichment, it is inequitable to permit

21   Defendants to retain the benefits they received, and are still receiving, without justification, from

22   their manipulation of LIBOR in an unfair, unconscionable and oppressive manner.  Defendants'

23   retention of such funds under circumstances making it inequitable to do so constitutes unjust

24   enrichment.

25   197.    The financial benefits Defendants derived rightfully belong to Plaintiffs.  The

26   Court should compel Defendants to disgorge, in a common fund for Plaintiffs' benefit, all

27   unlawful or inequitable proceeds Defendants received.  The Court should impose a constructive

28   trust upon all unlawful or inequitable sums Defendants received that are traceable to Plaintiffs.

COMPLAINT _____

934518.6

198.   Plaintiffs have no adequate remedy at law.

## FOURTEENTH CLAIM FOR RELIEF

## Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, et seq.

199.   Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

200.   Defendants entered into and engaged in an unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code section 16720.

201.   During the Relevant Period, Defendants controlled what LIBOR rate would be reported and therefore controlled prices in the market for securities and contracts paying returns based on LIBOR.  Defendants competed in this market.

202.   The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained or made artificial prices for LIBOR-based instruments and securities.  Defendants' conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

203.   Defendants' conspiracy, and the resulting impact on the market for LIBOR-based instruments and securities, occurred in and affected interstate and international commerce.

204.   As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

205.   Accordingly, Plaintiffs seek three times their damages caused by Defendants' violations of the Cartwright Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of the Cartwright Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)   That the Court enter an order declaring that Defendants' actions as set forth in this

COMPLAINT _____

934518.6

1    Complaint, and in other respects, violate the law;

2        (B)    That the Court enter judgment awarding Plaintiffs damages against Defendants for

3    all economic, monetary, actual, consequential and compensatory damages Plaintiffs suffered as a

4    result of Defendants' conduct, or rescission, together with pre- and post-judgment interest at the

5    maximum rate allowable by law;

6        (C)    That the Court award Plaintiffs exemplary or punitive damages against Defendants

7    to the extent allowable by law;

8        (D)    That the Court award Plaintiffs damages against Defendants for Defendants'

9    violation of the federal antitrust laws and RICO in an amount to be trebled in accordance with

10   those laws ;

11       (E)    That the Court issue an injunction prohibiting Defendants from continuing the

12   misconduct alleged in this Complaint, including their ongoing manipulation of LIBOR;

13       (F)    That the Court order the disgorgement of the ill-gotten gains Defendants derived

14   from their misconduct

15       (G)    That the Court award Plaintiffs restitution of all amounts they paid to Defendants

16   as consideration for notes and other financial instruments affected by Defendants' misconduct;

17       (H)    That the Court award Plaintiffs their costs of suit, including reasonable attorneys'

18   fees and expenses; and

19       (I)    That the Court award such other and further relief as the Court may deem just and

20   proper.

21

22

23

24

25

26

27

28

COMPLAINT _____

934518.6

**JURY DEMAND**

Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: August 23, 2011

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By: _____

Richard M. Heimann (State Bar No. 063607)
Joseph R. Saveri (State Bar No. 130064)
Eric B. Fastiff (State Bar No. 182260)
Brendan Glackin (State Bar No. 199643)
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Steven E. Fineman (State Bar No. 140335)
Michael J. Miarmi
250 Hudson Street, 8th Floor
New York, New York  10013-1413
Telephone:  (212) 355-9500
Facsimile: (212) 355-9592

Lowell Haky (State Bar No. 178526)
Vice President and Associate General Counsel
THE CHARLES SCHWAB CORPORATION
211 Main Street
San Francisco, California  94105
Telephone: (415) 667-0622
Facsimile: (415) 667-1638

*Attorneys for Plaintiffs*

- 40 -

COMPLAINT _____

934518.6